## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| ECHOSTAR CORPORATION,<br><br>        Petitioner,<br><br>   v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>        Respondents. | No. _____ |

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. § 706, 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, and Federal Rule of Appellate Procedure 15(a), EchoStar Corporation ("EchoStar") petitions this Court for review of the order of the Federal Communications Commission ("Commission" or "FCC") captioned *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses, Applying New Average Annual Gross Revenue Benchmarks for Small Business Bidding Credits, Amendment of the Commission's Rules with Regard to Commercial Operations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands*, Report

and Order and Second Report and Order, FCC 25-39, GN Docket Nos. 25-70, 25-71, 13-185 (rel. July 25, 2025) ("Order"). A copy of the Order is attached as Exhibit A to this petition. The Order was published in the Federal Register on August 4, 2025. Venue is proper in this Court under 28 U.S.C. § 2343 because EchoStar's principal place of business is in Englewood, Colorado.

The Order adopts significantly different competitive bidding rules for the upcoming Congressionally-mandated reauction of 200 AWS-3 wireless spectrum licenses in the Commission's inventory ("Auction 113") than applied during the Commission's prior auction of AWS-3 licenses in 2014 ("Auction 97"). These changes include the adoption of more restrictive designated entity ("DE") rules, such as a cap on the bidding credits available to small businesses, which will reduce both the potency and likelihood of participation by small businesses in Auction 113, undermine relied upon expectations that the competitive bidding rules for Auction 97 would continue to apply to any reauction of AWS-3 licenses, and potentially place EchoStar on the hook for a default payment penalty of billions of dollars after the conclusion of Auction 113. For the reasons discussed below, the Order should be set aside.

First, the Order is impermissibly retroactive in the primary, secondary, and selective senses of retroactivity. It violates EchoStar's due process rights, as well as its investment-backed expectations, by increasing EchoStar's liability for past conduct.

Second, the Order's decisionmaking violates the Administrative Procedure Act by "fail[ing] to consider an important aspect of the problem[.]" *Am. Wild Horse Campaign v. Raby*, 144 F.4th 1178, 1188 (10th Cir. 2025). Among other things, the Order did not sufficiently consider, or did not consider at all, evidence that broader designated entity participation would be an important factor contributing to the success of the auction. The Order also fails to address the fact that preservation of the same ground rules for the auction was a necessary premise of the guarantee executed by EchoStar to settle the dispute arising from the first auction.

Third, by failing to consider the guaranty contract that the Commission entered with EchoStar, the Order implicates *United States v. Winstar Corp.*, 518 U.S. 839 (1996) and the question of whether the agreement of the parties was predicated on the existence of the same ground rules.

Fourth, the Commission lacks authority to adopt new rules for the reauction of AWS-3 licenses. The plain text of the Communications Act states that "the Commission shall, by regulation, establish ***a*** competitive bidding methodology" for "each class of licenses or permits that the Commission grants through the use of a competitive bidding system." 47 U.S.C. § 309(j)(3). "A" methodology means *one* methodology. By changing the competitive bidding methodology for the AWS-3 licenses, the Commission has adopted two methodologies for the same class of licenses. Furthermore, the Commission did not respond to this line of argument in EchoStar's comments at all. The Commission's failure to respond meaningfully violates the Administrative Procedure Act, 5 U.S.C. § 551 *et. seq.*, and renders the *Order* arbitrary and capricious.

EchoStar respectfully requests that the Court vacate the Order with instructions that the Commission either preserve the old DE rules for the reauction, or if the DE rules are changed, remove the guaranty and associated obligations of EchoStar and its subsidiaries.

Respectfully submitted,

/s/ *Pantelis Michalopoulos*

Pantelis Michalopoulos
Matthew R. Friedman
Andrew Magloughlin
**STEPTOE LLP**
1330 Connecticut Ave NW
Washington, DC  20036
Tel:  202-429-3000
Fax: 202-429-3902

*Counsel for EchoStar Corporation*

August 29, 2025

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

ECHOSTAR CORPORATION,

              Petitioner,

    v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED
STATES OF
AMERICA,

              Respondents.

No. _____

## CORPORATE DISCLOSURE STATEMENT

EchoStar Corporation is a publicly traded corporation on the NASDAQ Global Select Market under the symbol "SATS." It has no subsidiaries with publicly traded equity. Its subsidiaries operate pay-TV, wireless, and satellite businesses. No publicly held corporation owns 10% or more of its stock.

/s/ *Pantelis Michalopoulos*

Pantelis Michalopoulos
Matthew R. Friedman
Andrew Magloughlin
**STEPTOE LLP**
1330 Connecticut Ave NW
Washington, DC 20036
Tel: 202-429-3000

Fax: 202-429-3902

*Counsel for EchoStar Corporation*

# EXHIBIT A

*Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses, Applying New Average Annual Gross Revenue Benchmarks for Small Business Bidding Credits, Amendment of the Commission's Rules with Regard to Commercial Operations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands*, Report and Order and Second Report and Order, FCC 25-39, GN Docket Nos. 25-70, 25-71, 13-185 (rel. July 25, 2025) ("*Order*").

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Enhancing National Security Through the Auction | ) | GN Docket No. 25-70 |
| of AWS-3 Spectrum Licenses | ) | |
| | ) | |
| Applying New Average Annual Gross Revenue | ) | GN Docket No. 25-71 |
| Benchmarks for Small Business Bidding Credits | ) | |
| | ) | |
| Amendment of the Commission's Rules with | ) | GN Docket No. 13-185 |
| Regard to Commercial Operations in the 1695- | ) | |
| 1710 MHz, 1755-1780 MHz, and 2155-2180 MHz | ) | |
| Bands | ) | |
| | ) | |

**REPORT AND ORDER AND SECOND REPORT AND ORDER**

**Adopted: July 24, 2025**                    **Released: July 25, 2025**

By the Commission: Chairman Carr and Commissioner Trusty issuing separate statements; Commissioner Gomez concurring in part and issuing separate statement.

**TABLE OF CONTENTS**

Heading                                                                 Paragraph #

I. INTRODUCTION ..................................................................................................1
II. BACKGROUND ..................................................................................................6
III. COMPETITIVE BIDDING RULES TO BE USED FOR FUTURE AUCTIONS OF AWS-3
   SPECTRUM LICENSES ........................................................................................22
   A. The 2015 Reforms to the Competitive Bidding Rules Will Apply to Future Auctions of
      AWS-3 Spectrum Licenses ..............................................................................23
   B. Updating Eligibility Criteria for Small and Very Small Business Bidding Credits for
      Auctions of AWS-3 Spectrum Licenses ............................................................28
   C. Rural Service Provider Bidding Credits for Future Auctions of AWS-3 Spectrum
      Licenses.........................................................................................................35
IV. THE COMMISSION IS NOT REQUIRED TO USE THE 2014 COMPETITIVE BIDDING
   RULES FOR AUCTION 113 IN 2025 .....................................................................38
   A. Applying the Current Part 1 Competitive Bidding Rules in Auction 113 is Not a Violation
      of Due Process ...............................................................................................41
   B. The Commission Provided the Notice and Opportunity for Comment Required by the
      Administrative Procedure Act...........................................................................49
   C. Applying Part 1 Rules in Effect at the Time of Any Future AWS-3 Auctions Will Not
      Breach Any Contractual Duty of the Commission ..............................................53
   D. EchoStar's Pre-Auction Request for Post-Auction Relief Is Not Ripe.........................56
V. TRIBAL LICENSING WINDOW .........................................................................58
VI. PROCEDURAL MATTERS ..................................................................................64
VII. ORDERING CLAUSES........................................................................................69

Appendix A – Final Rules
Appendix B – Final Regulatory Flexibility Analysis
Appendix C – List of Commenters

## I. INTRODUCTION

1.      Advancing U.S. leadership in wireless is good for our economy, for our national security, and for ensuring that every American has access to affordable, high-speed service.  That is why we are focused on freeing up more spectrum for consumer use.

2.      Today, we move to satisfy a bipartisan congressional mandate to auction licenses for AWS-3 spectrum in the Commission's inventory.[1]  The proceeds from this auction will fund the Commission's ongoing efforts to protect American networks from untrustworthy and insecure foreign equipment.

3.      The Commission has held spectrum auctions for roughly 30 years.[2]  Auctions assign spectrum licenses to their highest and best use by allowing bidders to reveal their preferences and discover a market-clearing price.  Our auctions have proven a resounding success largely because we have updated our rules to account for the lessons of the past.  One example is especially relevant today.  In 2015, we reformed our rules to protect the integrity of our auctions from fraud, collusion, and manipulation while promoting participation by *bona fide* small businesses and rural providers.

4.      The Order we adopt today advances those time-tested objectives.  First, we adopt designated entity eligibility requirements for future AWS-3 spectrum license auctions that are in harmony with the requirements used in every 5G auction we have held since 2015.  Updating our AWS-3 rules to match settled practice will give small businesses and rural service providers the predictability they need to participate meaningfully at auction.  Next, we update our general part 1 competitive bidding rules for categorizing an entity as a "small business concern," pursuant to the Small Business Runway Extension Act of 2018 (SBREA).[3]  In adopting these rules, we reject arguments from the affiliates of Auction 97 defaulters—whose unwillingness to pay the full amount of their gross winning bids led to significant AWS-3 spectrum sitting fallow in the Commission's inventory for nearly a decade—that we conduct the next auction of AWS-3 licenses under the same rules that enabled the very bidding behavior that led to their defaults in the first place.  Finally, we decline to adopt a Tribal priority licensing window in advance of the auction.

5.      Shortly after the Commission adopted the Notice of Proposed Rulemaking in this proceeding (*NPRM*),[4] the Office of Economics and Analytics (OEA), jointly with the Wireless Telecommunications Bureau (WTB), sought comment on proposed procedures for an auction of AWS-3

---

[1] *See* Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159, Div. E, Title LIV, § 5401–5405 (Spectrum and Secure Technology and Innovation Act), § 5403 (mandating that the Commission initiate a system of competitive bidding for licenses for unassigned AWS-3 spectrum within 18 months of Dec. 23, 2024) (2024), https://www.congress.gov/118/plaws/publ159/PLAW-118publ159.pdf.

[2] Section 309(j) of the Communications Act of 1934, as amended (Communications Act or Act) authorizes the Commission's use of competitive bidding when granting spectrum licenses.  47 U.S.C. § 309(j).

[3] *See* 15 U.S.C. § 632(a)(2)(C)(ii)(II), *as amended by* Small Business Runway Extension Act of 2018, Pub. L. 115-324 (Dec. 17, 2018) (SBREA); 13 CFR § 121.903(a)(1)(ii).

[4] *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses, et al.*, GN Docket Nos. 25-70, 25-71, and 13-185, Notice of Proposed Rulemaking, FCC 25-12 (rel. Feb. 28, 2025) (*NPRM*).

licenses (Auction 113).[5] Our Order today will allow OEA and WTB to establish final procedures for Auction 113 in accordance with the adopted rules and to move forward with that auction.

## II. BACKGROUND

6. In 2014, the Commission adopted service and bidding rules for the auction of AWS-3 spectrum licenses (Auction 97) in the 1695–1710 MHz, 1755–1780 MHz, and 2155–2180 MHz frequencies.[6] Bidding in Auction 97 began in November 2014 and ended in January 2015.[7] Auction 97 raised a total of $41,329,673,325 in net bids, with 31 bidders placing winning bids for a total of 1,611 licenses.[8] Following that auction, certain winning bidders selectively defaulted on winning bids for 197 licenses.[9] In March 2025, the Commission announced that it would conduct a new auction—Auction 113—for the AWS-3 spectrum that remained in the agency's inventory, most of which was available primarily due to Auction 97 defaults.[10] Because the Auction 97 defaults bear on Auction 113 and the decisions we make today, we briefly recount the relevant history below.

7. *The Commission Provides Notice in 2014 that All AWS-3 Auctions Would Be Subject to Generally Applicable Rule Changes.* Prior to Auction 97, the Commission provided clear notice that any and all future auctions of AWS-3 spectrum licenses would be subject to generally applicable changes to the part 1 competitive bidding rules.[11] In particular, the Commission determined that any AWS-3 auction

---

[5] *Auction of Advanced Wireless Services (AWS-3) Licenses; Comment Sought on Competitive Bidding Procedures for Auction 113*, AU Docket No. 25-117, Public Notice, DA 25-193 (OEA-WTB, rel. Mar. 11, 2025) (*Auction 113 Bidding Procedures Comment Public Notice*).

[6] *Amendment of the Commission's Rules with Regard to Commercial Operations in the 1695–1710 MHz, 1755–1780 MHz, and 2155–2180 MHz Bands*, GN Docket No. 13-185, Report and Order, 29 FCC Rcd 4610 (2014) (*AWS-3 2014 Report and Order*); *Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for November 13, 2014; Notice and Filing Requirements, Reserve Prices, Minimum Opening Bids, Upfront Payments and other Procedures for Auction 97*, AU Docket No. 14-78, Public Notice, 29 FCC Rcd 8386 (WTB 2014) (*Auction 97 Procedures Public Notice*). Except to the extent modified by this Report and Order, all of the service rules established by the Commission in 2014 for AWS-3 licenses remain in effect.

[7] *See generally Auction of Advanced Wireless Services (AWS-3) Licenses Closes, Winning Bidders Announced for Auction 97*, Public Notice, 30 FCC Rcd 630 (WTB 2015) (*Auction 97 Closing Public Notice*).

[8] *Id.* at 630, para. 1. At the close of Auction 97, spectrum associated with three licenses offered in that auction remained in the Commission's inventory. Auction 97: Advanced Wireless Services (AWS-3), https://www.fcc.gov/auction/97 (last visited July 24, 2025) (noting that 3 licenses were held by the FCC at the close of bidding).

[9] Letter from Mark F. Dever, Counsel to Northstar, to Jean Kiddoo, Deputy Bureau Chief, Wireless Telecommunications Bureau, ULS File Nos. 0006670613 (Oct. 1, 2015) (Northstar Selective Default Letter); Letter from Ari Q. Fitzgerald, Counsel to SNR, to Jean Kiddoo, Deputy Bureau Chief, Wireless Telecommunications Bureau, ULS File Nos. 0006670667 (Oct. 1, 2015) (SNR Selective Default Letter); *see SNR Wireless LicenseCo, LLC, Notice of Interim Default Payment Obligation for Auction 97 Licenses*, Letter Order, 30 FCC Rcd 10704 (WTB 2015) (accepting SNR's selective defaults) (*SNR Interim Default Payment Letter*); *Northstar Wireless, LLC, Notice of Interim Default Payment Obligation for Auction 97 Licenses*, Letter Order, 30 FCC Rcd 10700 (WTB 2015) (accepting the Northstar's selective defaults) (*Northstar Interim Default Payment Letter*). Northstar requested to selectively default on winning bids for 84 licenses. *See* Northstar Selective Default Letter at Attachment 2. SNR requested to selectively default on winning bids for 113 licenses. *See* SNR Selective Default Letter at Attachment 2.

[10] Auction 113 will make available 200 licenses, *see Auction 113 Bidding Procedures Comment Public Notice* at 3, para. 5, of which 197 are analogous to licenses covered by winning bids that were selectively defaulted by Northstar and SNR.

[11] *AWS-3 2014 Report and Order*, 29 FCC Rcd at 4675, para. 177 (stating that any AWS-3 auction would be conducted "subject to any modifications that the Commission may adopt for its part 1 general competitive bidding rules in the future").

would be conducted in accordance with the general competitive bidding rules set forth in part 1, subpart Q of the Commission's rules except as "otherwise provided in" part 27.[12]

8.    The part 1 competitive bidding rules advance the agency's statutory directive by ensuring that designated entities (DEs)—small businesses and rural telephone companies—have a meaningful opportunity to access wireless spectrum in FCC auctions.[13]  DEs are eligible for auction bidding credits, represented as percentage discounts from their winning bids.  Eligibility requirements for DEs are set on a service-by-service basis, the capital requirements and other characteristics of each particular service establishing the appropriate threshold.[14]

9.    The Commission adopted service-specific bidding credits and DE eligibility requirements for the AWS-3 bands prior to Auction 97.[15]  The Commission provided a 15% small business bidding credit to entities with average annual gross revenues not exceeding $40 million and a 25% very small business bidding credit to entities with average annual gross revenues not exceeding $15 million.[16]  The average gross revenues would be calculated from the preceding three years.[17]  These thresholds were consistent with the standardized schedule of DE bidding credits in the Commission's rules at the time.[18]  The relevant definitions and thresholds for particular bidding credits were codified in the part 27 AWS-3 service rules.[19]  The DE eligibility requirements were modeled after the small business size standards and associated bidding credits that the Commission adopted for the AWS-1 band, based on the belief that the AWS-3 bands would be employed for purposes similar to those for the AWS-1 band.[20]

10.    *DISH's DEs Improperly Claim $3.3 Billion in FCC Bidding Credits Intended For "Very Small Businesses."*  Two participants in Auction 97—Northstar Wireless, LLC (Northstar) and SNR Wireless License Co (SNR)—made extensive use of bidding credits intended for "very small businesses."  In total, SNR and Northstar improperly claimed $3.3 billion in credits under the Commission's DE

---

[12] 47 CFR § 27.1105 (1695–1710 MHz, 1755–1780 MHz and 2155–2180 MHz bands subject to competitive bidding); *AWS-3 2014 Report and Order*, 29 FCC Rcd at 4674–76, paras. 176–79.

[13] *See* 47 U.S.C. § 309(j)(3) & (4); 47 CFR § 1.2110.  Section 309(j)(3) requires the Commission to design its competitive bidding systems to promote objectives and purposes and grants the Commission the discretion to achieve what it considers to be the optimal balance among these objectives and purposes.  Section 309(j)(4) specifies the content of regulations governing such systems.

[14] *Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, PP Docket No. 93-253, Second Memorandum Opinion and Order, 9 FCC Rcd 7245, 7269, para. 145 (1994); *see Updating Part 1 Competitive Bidding Rules et al.*, WT Docket Nos. 14-170 and 05-211, GN Docket No. 12-268, RM-11395, Report and Order, Order on Reconsideration of the First Report and Order, Third Order on Reconsideration of the Second Report and Order, Third Report and Order, 30 FCC Rcd 7493, 7529, para. 85 (2015) (continuing practice of evaluating the definition of a small business on a service-by-service basis) (*Updating Part 1 Report and Order*) (modified by Erratum, 30 FCC Rcd 8518 (WTB 2015)); 47 CFR § 1.2110(f)(1).  *See, e.g.*, 47 CFR § 27.1106 (DE eligibility expressly for AWS-3).

[15] *AWS-3 2014 Report and Order*, 29 FCC Rcd at 4680–81, para. 189.

[16] *Id.*

[17] *Id.*

[18] *Id.*; *see* 47 CFR § 1.2110(f)(2)(ii-iii) (2014).

[19] 47 CFR § 27.1106 (2014).

[20] *AWS-3 2014 Report and Order*, 29 FCC Rcd at 4678–81, paras. 185–89.  Accordingly, the AWS-3 competitive bidding rules provide for two of the possible three small business definitions and associated bidding credit levels set out in part 1's standardized schedule for small business bidding credits.  *Compare* 47 CFR § 1.2110(f)(2) (2014) *with id.* § 27.1106 (2014).

rules.[21]  They ultimately placed over \$13.3 billion in gross winning bids on 702 of the 1611 licenses in Auction 97, or 43.5% of the available licenses.[22]

11.    SNR and Northstar were formed immediately before Auction 97 and funded almost exclusively by DISH Network Corporation (DISH).[23]  During the course of reviewing long-form applications following Auction 97, the Commission denied bidding credit eligibility for both Northstar and SNR.[24]  The Commission determined that the companies were under the *de facto* control of DISH and therefore were ineligible for the \$3.3 billion of DE bidding credits for "very small businesses."[25]

12.    Because SNR and Northstar were ineligible for the DE bidding credits they claimed, they were required to pay the full amount of their \$13.3 billion bid price for those licenses.[26]  DISH and its DEs appealed the Commission's determination.  The litigation finally came to a close in 2023 when a federal court of appeals upheld the Commission's determination and the Supreme Court declined to grant certiorari.[27]  Separately, Vermont National Telephone Company has alleged that DISH and its DEs violated the False Claims Act during Auction 97; that lawsuit remains pending in the U.S. District Court for the District of Columbia.[28]

13.    *DISH's DEs Selectively Default on the AWS-3 Licenses They Won.*  Northstar and SNR selectively defaulted on winning bids for 197 AWS-3 licenses.[29]  Pursuant to the Commission's well-established part 1 rules governing defaults on winning bids, Northstar and SNR became liable for the difference between their winning bids in Auction 97 and the amount of winning bids for licenses accessing the same spectrum in subsequent auctions.[30]  Also pursuant to those rules, SNR and Northstar became liable for an additional payment equal to 15% of their own bids or the applicable subsequent

---

[21] *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695–1710 MHz, and 1755–1780 MHz and 2155–2180 MHz Bands*, Memorandum Opinion and Order on Remand, 35 FCC Rcd 13317, 13318, para. 2 (2020) (*Auction 97 Bidding Credit Order on Remand*).

[22] *See Auction 97 Closing Public Notice*, 30 FCC Rcd at 640–735, Attach. A.

[23] *See Auction 97 Bidding Credit Order on Remand*, 35 FCC Rcd at 13321–22, paras. 14, 16.  DISH is a subsidiary of EchoStar.  EchoStar Comments at 2.  During Auction 97, the principals of Council Tree collectively owned an indirect minority equity interest in the controlling interest owner in Northstar.  Council Tree Comments at 7, n.11.

[24] *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695–1710 MHz, 1755–1780 MHz and 2155–2180 MHz Bands*, Memorandum Opinion and Order, 30 FCC Rcd 8887, 8950–51, paras., 152, 154 (2015) (*Auction 97 Bidding Credit Order*) (finding Northstar and SNR not eligible for claimed bidding credits), *remanded in part by SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017) *denial of bidding credits aff'd by Auction 97 Bidding Credit Order on Remand*, 35 FCC Rcd at 13365, paras. 158–59, *aff'd Northstar Wireless, LLC v. FCC*, 38 F.4th 190 (D.C. Cir. 2022), *cert. denied* 143 S.Ct. 2693 (2023) (*Northstar Wireless, LLC v. FCC*).  In 2023, EchoStar acquired DISH and assumed its obligations.  *See* EchoStar Comments at 2 (noting that DISH currently is a subsidiary of EchoStar).

[25] *Auction 97 Bidding Credit Order*, 30 FCC Rcd at 8940, 8951–52, paras. 128, 158, 160; *see also Auction 97 Bidding Credit Order on Remand*, 35 FCC Rcd 13338, para. 64.

[26] *Auction 97 Bidding Credit Order*, 30 FCC Rcd at 8950–52, paras. 153, 155, 158, 160.

[27] *Northstar Wireless, LLC v. FCC*.

[28] *See United States ex. rel. Vermont National Telephone Co.v. Northstar Wireless, LLC* , No. 15-cv-728-CKK-MAU, 2025 WL 113407 (D.D.C. Apr. 15, 2025) (Magistrate's Report and Recommendation regarding pending action).

[29] *See supra* note 9.

[30] *SNR Interim Default Payment Letter*, 30 FCC Rcd at 10706; *Northstar Interim Default Payment Letter*, 30 FCC Rcd at 10701–02; *see* 47 CFR § 1.2104(g)(2)(i).

winning bids, whichever was less.[31] The upcoming auction of AWS-3 licenses may provide subsequent winning bids that ultimately determine the size of any deficiency payment owed by Northstar and SNR.

14. *The Commission Overhauls its Competitive Bidding Rules and DE Eligibility in Response to Auction 97 Irregularities.* After the close of Auction 97, the Commission became aware of allegations of significant bidding irregularities on the part of SNR and Northstar.[32] The Commission also received numerous complaints about abuses of the DE program beyond the DISH-controlled entities. Commenters alleged that supposedly "small businesses" that claimed bidding credits were operating at the direction and control of large, well-financed corporations.[33]

15. In response to these concerns, the Commission in 2015 significantly reformed its competitive bidding rules for future spectrum auctions.[34] The 2015 reforms were expressly informed by "lessons learned" in Auction 97.[35] Many of the Commission's reforms were intended to expand the range of businesses eligible for DE benefits while simultaneously ending practices that had incentivized larger players to manipulate the DE regime.[36] As the Commission explained, the changes to the part 1 rules were designed to promote auction participation by small businesses while ensuring "that valuable bidding credits are available only to those Congress intended," namely, small businesses and rural providers.[37]

16. Although the 2015 reforms expanded DE eligibility by raising the gross revenue thresholds for small business bidding credits and establishing a new bidding credit for eligible rural service providers, it also took several steps to protect the integrity of the DE program by: (i) prohibiting joint bidding arrangements between applicants; (ii) prohibiting the common control of separate auction applicants; (iii) requiring the establishment, on an auction-by-auction basis, of a maximum total discount of no less than $25 million that a winning eligible DE may receive; and (iv) modifying attribution rules to prevent the unjust enrichment of ineligible entities.[38] These and other reforms resulted in changes to the Commission's part 1 rules, which apply generally to spectrum auctions. While existing service-specific competitive bidding rules, including those for the AWS-3 bands, specified that the part 1 competitive

---

[31] *SNR Interim Default Payment Letter*, 30 FCC Rcd at 10706; *Northstar Interim Default Payment Letter*, 30 FCC Rcd at 10701-02; *see* 47 CFR § 1.2104(g)(2)(ii-iii); *Auction 97 Procedures Public Notice*, 29 FCC Rcd at 8451, para. 240.

[32] *See, e.g., Auction 97 Bidding Credit Eligibility Decision*, 30 FCC Rcd at 8944, para. 140 (discussing VTel Petition to Deny allegation that Northstar and SNR "at times placed double and triple bids on the same licenses in the same round" to create a false appearance of competition for the subject licenses).

[33] *See Updating Part 1 Report and Order* at 7512, para. 43 ("A number of commenters suggested that we restrict larger nationwide and regional carriers, entities with a certain number of end-user customers, and/or other large companies from providing a material portion of the total capitalization of DE applicants or otherwise exercising control over such applicants as part of the definition of 'material relationship.[']") (citations omitted).

[34] *Id.* at 7496–98, paras. 6–8 & n.10.

[35] *Request for Further Comment on Issues Related to Competitive Bidding Proceeding Updating Part 1 Competitive Bidding Rules*, Public Notice, 30 FCC Rcd 4153, 4154, para. 3 (WTB 2015). While the Commission issued the Notice of Proposed Rulemaking to revise its part 1 rules in advance of the Broadcast Incentive Auction and prior to bidding in Auction 97, "to allow interested parties an opportunity to take into account any 'lessons learned' from Auction 97, the Wireless Telecommunications Bureau ('WTB') extended the comment deadline for the initial [Notice of Proposed Rulemaking] three times." *Id.*

[36] *See Updating Part 1 Report and Order*, 30 FCC Rcd at 7495–97, paras. 4–6; *see also id.* at 7544, para. 121 (noting that the bidding credit cap is both significant enough to assist eligible entities to have the opportunity to compete at auction, but reasonable enough to ensure that ineligible entities are not encouraged to undercut the Commission's rules).

[37] *Id.* at 7528, para. 82.

[38] *Id.* at 7497–98, para. 8.

bidding rules would apply to mutually exclusive applications for licenses,[39] the specific provisions related to designated entity eligibility in those services were never updated to reflect the increased gross revenue thresholds and the availability of the rural service provider bidding credit.[40]

17. *Congress Tightens the Definition of "Small Business Concern" for Federal Programs.* In the 2018 SBREA, Congress amended provisions of the Small Business Act for defining a "small business concern."[41] In relevant part, the 2018 amendments required federal agencies to treat an entity as a "small business concern" only if the agency considered average gross receipts over the preceding five years.[42]

18. In requiring a five-year lookback, Congress sought to more accurately reflect a business's long-term size. Congress also sought to combat fraud and abuse by making it harder for companies to manipulate short-term revenue fluctuations to improperly qualify as "small."

19. The 2018 statutory amendments also responded to longstanding criticisms—raised over the years by Congress and agencies like the Small Business Administration (SBA) Office of Inspector General[43] and the GAO[44]—that large firms had exploited loopholes to win preferential contracts and discounts intended for small businesses. Although service-specific small business definitions that the Commission has adopted for bidding credit eligibility since 2019 contain the congressionally mandated five-year lookback period,[45] the Commission has not yet amended any of its prior-existing rules—including prior service-specific rules and the general part 1 rules—to conform with the amended Small Business Act's standards.[46]

20. *To Fund Critical National Security Objectives, Congress Authorizes the FCC to Auction AWS-3 Licenses that DISH's DEs Selectively Defaulted After Auction 97.* In the Spectrum and Secure Technology and Innovation Act of 2024, Congress directed the Commission to initiate systems of competitive bidding to grant licenses for spectrum in its inventory in the AWS-3 spectrum bands.[47]

---

[39] 47 CFR § 27.1105.

[40] 47 CFR § 27.1106 (DE rules expressly for the 1695–1710 MHz, 1755–1780 MHz, and 2155–2180 MHz bands, *i.e.*, AWS-3); *see also,* 47 CFR §§ 22.229 (Paging); 22.962 (800 MHz Cellular, incorporating rules for Paging); 24.720(b) (Broadband PCS); 27.210(b) (WCS); 27.502(a) (700 MHz); 27.1218(a) (BRS).

[41] *See* SBREA, Pub. L. 115-324 (Dec. 17, 2018).

[42] 15 U.S.C. § 632(a)(2)(C)(ii)(II), *as amended by* SBREA; *see* 13 CFR § 121.903(a)(1)(ii) (Small Business Administration regulations on use of size standards by Federal agencies requiring five-year look-back period).

[43] *Strengthening Participation of Small Businesses in Federal Contracting and Innovation Research Programs: Hearing before the S. Comm. on Small Business and Entrepreneurship*, 109th Cong. 32-39 (2006) (statement of Eric M. Thorson, Inspector General, U.S. Small Business Administration)

[44] *Are Big Businesses Being Awarded Contracts Intended for Small Businesses?: Hearing Before the H. Comm. on Small Businesses*, 108th Cong. 104–117 (2003) (statement of David E. Cooper, Director, Acquisition and Sourcing Management, United States General Accounting Office, GAO 03-704T)

[45] *See* 47 CFR § 27.1402 (3.7 GHz Service); *id.* § 27.1601 (3.45 GHz Service); *id.* § 27.1219 (Educational Broadband Service).

[46] The Small Business Administrator is authorized to specify procedures for determining a party's eligibility as a small business concern. 15 U.S.C. § 632(a)(2)(A). The SBA final rule implementing the SBREA noted in part "[t]his new calculation [using five years rather than three] does not affect existing non-SBA size standards that specify a 3-year average unless the responsible agency proposes and finalizes changes to the existing specification of a 3-year average." Small Business Administration, Small Business Size Standards; Calculation of Annual Average Receipts, 84 Fed. Reg. 66,561, 66,569 (Dec. 5, 2019).

[47] *Spectrum and Secure Technology and Innovation Act* § 5403 (mandating that the Commission initiate systems of competitive bidding for licenses for unassigned AWS-3 spectrum within 18 months of Dec. 23, 2024).

Auction proceeds will support the Commission's Supply Chain Reimbursement Program,[48] which reimburses eligible advanced communications service providers for their costs to remove, replace, and dispose of untrustworthy Huawei Technologies Company or ZTE Corporation equipment and services.[49]

21.    In February 2025, the Commission issued the *NPRM* as the first step to conduct Auction 113.[50]  As the 2015 reforms to the part 1 rules that were adopted in the immediate aftermath of Auction 97 to protect the integrity of Commission spectrum auctions already apply to this auction, the *NPRM* sought to update the part 27 requirements for DE eligibility in AWS-3 spectrum auctions based on the intervening developments described above, proposing to set the average annual gross revenue eligibility requirements for very small and small business bidding credits at $20 million and $55 million, respectively and to incorporate the amended Small Business Act's five-year lookback period for calculating gross revenues.[51]  The *NPRM* also proposed to make the rural service provider bidding credit adopted in 2015 available for future auctions of AWS-3 spectrum licenses.[52]  These proposals would align DE eligibility requirements for Auction 113 with the requirements used in auctions for 5G-ready spectrum licenses conducted since Auction 97.[53]

## III.    COMPETITIVE BIDDING RULES TO BE USED FOR FUTURE AUCTIONS OF AWS-3 SPECTRUM LICENSES

22.    We affirm that, consistent with the Commission's AWS-3 service-specific rules,[54] any future auctions will be conducted using the part 1 competitive bidding rules that are in effect at the time of the auction.  For Auction 113, that includes the reforms to the DE rules adopted as part of the 2015 *Updating Part 1 Report and Order* and any other changes that may be effectuated prior to the auction.[55] The Commission has repeatedly found that application of its part 1 competitive bidding rules, as modified by the 2015 *Updating Part 1 Report and Order*, to individual services serves the public interest.[56]

---

[48] *Id.* § 5404(b)-(c).  The Act also directs proceeds from the auction of AWS-3 licenses to reimburse funds borrowed by the Department of Commerce for its Regional Technology and Innovation Hubs program.  *Id.* § 5404(d).

[49] *See Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd 14284 (2020).

[50] *NPRM* at 2, para. 2.

[51] *Id.* at 10–11, Appx. A (proposed amendments to part 1 and part 27 DE rules).

[52] *Id.* at 5–6, paras. 15–16.

[53] *See* 47 CFR § 27.1301(a)(1–2) (service rules for the 600 MHz band auction); *id.* § 27.1601(a)(1)(i–ii) (3.45 GHz Service); *id.* § 27.1402 (3.7 GHz Service); *id.* § 27.1219 (Educational Broadband Service); *see also id.* § 96.30 (Citizens Broadband Radio Service) (using a 3-year lookback period because these rules were adopted prior to the SBREA).

[54] 47 CFR § 27.1105.

[55] Of particular note, currently the Commission is considering a proposal to a require auction applicants to make certain certifications as to whether they are owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary.  *See Protecting our Communications Networks by Promoting Transparency Regarding Foreign Adversary Control*, GN Docket No. 25-166, Notice of Proposed Rulemaking, FCC 25-28 at 20, para. 40 (2025) (*Foreign Adversary NPRM*).  If such a rule were to be adopted and made effective prior to the deadline for submitting an application to participate in Auction 113, the new requirement could apply to Auction 113 applicants.

[56] *See, e.g.*, *C and F Block Broadband PCS Spectrum Auction Scheduled for December 12, 2000*, DA 00-2259, Public Notice, 15 FCC Rcd 19485, 19489 (WTB 2000) (over the course of three auctions involving C Block and 2 involving F Block prior to Auction 35, the Commission "*revis[ed] the service and auction rules for auction of C and F block PCS licenses . . .* [including] that some licenses would be available to all bidders in "open" bidding, while other licenses would be available only to entrepreneurs in "closed" bidding.  The Commission established open bidding for all C and F block licenses available but unsold in Auction No. 22 or any subsequent auction.  The Commission also established open bidding for the following licenses:  two of the three reconfigured 10 MHz C block licenses in Tier 1, one of the three reconfigured 10 MHz C block licenses in Tier 2, the 15 MHz C block

(continued….)

Consistent with that precedent, we find today that conducting Auction 113 using these updated rules would similarly serve the public interest.

### A. The 2015 Reforms to the Competitive Bidding Rules Will Apply to Future Auctions of AWS-3 Spectrum Licenses

23. In 2015, the Commission modified its part 1 competitive bidding rules to facilitate competitive entry into the wireless industry by small businesses with capital and operational experience.[57] The Commission sought to "provid[e] meaningful opportunities to *bona fide* small businesses and rural service providers . . . to participate in auctions and in the provision of spectrum-based services, and in providing such opportunities, to prevent unjust enrichment."[58] While the record in that proceeding supported these changes, some commenters, including Council Tree, strongly opposed several proposals.[59] Council Tree's arguments initially failed to persuade the Commission, which proceeded to modify its rules.[60] Council Tree later failed to persuade the U.S. Court of Appeals for the Third Circuit, which upheld certain rules that were challenged by Council Tree.[61] The Third Circuit found that the Commission, in the *Updating Part 1 Order*, "not only set forth a policy that is likely to allow continued participation by DEs, but also rationally explained why it expected no significant loss of DE participation."[62] Now, in this proceeding, Council Tree seeks to revive those failed arguments.[63] But they are no more persuasive now than they were when the Commission first rejected them a decade ago.

24. New data and the Commission's experience administering auctions over the last ten years prove the success of the modernized DE rules. Publicly available auction results demonstrate that the

(Continued from previous page)
licenses in Tier 1, and all F block licenses (Tier 1 and Tier 2). *The Commission established small and very small business bidding credits of 15 percent and 25 percent, respectively, for licenses won in open bidding and eliminated bidding credits for licenses won in closed bidding.* Additionally, the Commission removed from its rules the Section 24.710 license cap, which had prohibited an applicant from winning more than 98 of the licenses available in the C and F blocks. Finally, the Commission decided that the Commercial Mobile Radio Services spectrum cap would continue to apply to C and F block licenses, including those won in Auction No. 35.") (emphasis added).

[57] *Updating Part 1 Report and Order*, 30 FCC Rcd at 7495, para. 4 (seeking "to provide greater flexibility for small businesses to gain an on-ramp into the wireless industry by leveraging leasing and other spectrum use agreements to gain access to capital and operational experience").

[58] *Id.* at 7494, para. 1. The Commission noted that "this rulemaking does not resolve any of the specific allegations made against any particular applicant or applicants in Auction 97 under the Commission's prior rules" though it did "address concerns raised generally by commenters about how designated entities partner with larger entities," the issue that ultimately lead to a determination that Northstar and SNR Wireless were not designated entities and resulted in defaults on many of their winning bids. *Updating Part 1 Report and Order*, 30 FCC Rcd at 7496. *See also Council Tree Investors, Inc., v. Federal Communications Commission*, 863 F.3d 237, 244 (2017) ("Council Tree admits that two DEs [Northstar and SNR], allegedly 'financed in large part by investments from DISH,' prompted the concern that led to this rulemaking[.]").

[59] *See* Council Tree Comments, WT Docket Nos. 14-170, 05-211, GN Docket No. 12-268, RM-11395, at 28 (rec. May 14, 2015).

[60] *See, e.g.*, *Updating Part 1 Report and Order*, 30 FCC Rcd at 7539–46, paras. 109–26 (adopting a rule for caps on DE credits).

[61] *Council Tree Investors, Inc. v. FCC*, 863 F.3d 237 (3d Cir. 2017).

[62] *Id.* at 241.

[63] In response to the *NPRM*, Council Tree relies on many of the arguments it made in 2015, attaching a lengthy appendix taken directly from the 2015 proceeding. *See* Council Tree Comments, WT Docket Nos. 14-170, 05-211, GN Docket No. 12-268, RM-11395, at 28 (rec. May 14, 2015) (contending that given "the impact of the Bidder Effect on FCC spectrum auctions, an inescapable conclusion emerges – the [2014] level of DE auction participation, and the competition it brings, should be preserved or improved going forward, not restricted or cut back").

Commission and Court accurately foresaw that the rules adopted then would offer *bona fide* designated entities opportunities to participate in auctions and the provision of spectrum-based services. In every spectrum license auction since, the percentage of winning bidders that are designated entities has remained similar to or has risen higher than the percentage in Auction 97.[64] In six of those eight auctions, the percentage of applicants qualifying to bid that were designated entities was higher than in Auction 97.[65] This data meaningfully demonstrate that, consistent with the Commission's statutory duty,

---

[64] Different auctions inevitably involve different participants, including designated entities, yet comparing the performance of those different entities still provides a relative measure of the effectiveness of the applicable DE rules, including the improvements the *Updating Part 1 Report and Order* made by making more parties designated entities. Comparisons involving Auction 97, however, present a particular difficulty, given the subsequent determination that Northstar and SNR were not eligible designated entities as they had claimed. Including Northstar and SNR as designated entities, 48% (15 of 31) of winning bidders in Auction 97 were designated entities. *See Auction 97 Closing Public Notice*, 30 FCC Rcd 630, Attach. B. One subsequent auction, Auction 103, had a similar but slightly lower percentage, specifically 46% (13 of 28) of winning bidders. *Incentive Auction of Upper Microwave Flexible Use Service Licenses in the Upper 37 GHz, 39 GHz, and 47 GHz Bands for Next-Generation Wireless Services Closes; Winning Bidders Announced for Auction 103*, AU Docket No. 19-59, Public Notice, 35 FCC Rcd 2015, 2032–34, Attach. B (WTB-OEA 2020). However, if Northstar and SNR are included but no longer considered designated entities, the percentage in Auction 97 falls to 42% (13 of 31), meaning every subsequent auction has had a higher percentage of designated entities among its winning bidders. Moreover, in three auctions, Auctions 1002, 105, and 108, the percentage of designated entities among winning bidders approached 80%, or nearly double the percentage in Auction 97, even though the total number of winning bidders in the subsequent auctions was larger. *See Auction of Flexible-Use Licenses in the 2.5 GHz Band Closes; Winning Bidders Announced for Auction 108*, AU Docket No. 20-429, Public Notice, 37 FCC Rcd 10117, 10128–133, Attach. A (WTB-OEA 2022) (78% of winning bidders (49 of 63) claimed eligibility for a DE bidding credit) (*Auction 108 Closing Public Notice*); *Auction of Flexible-Use Service Licenses in the 3.45–3.55 GHz Band Closes; Winning Bidders Announced for Auction 110*, AU Docket No. 21-62, Public Notice, 37 FCC Rcd 308, 320–322, Attach. A (WTB-OEA 2022) (57% of winning bidders (13 of 23) claimed eligibility for a DE bidding credit) (*Auction 110 Closing Public Notice*); *Auction of Flexible-Use Service Licenses in the 3.7–3.98 GHz Band Closes; Winning Bidders Announced for Auction 107*, AU Docket No. 20-25, Public Notice, 36 FCC Rcd 4318, 4329–32 (WTB-OEA 2021) (52% of winning bidders (11 of 21) claimed eligibility for a DE bidding credit) (*Auction 107 Closing Public Notice*); *Auction of Priority Access Licenses in the 3550–3650 MHz Band Closes; Winning Bidders Announced for Auction 105*, AU Docket No. 19-244, Public Notice, 35 FCC Rcd 9287, 9299–9317, Attach. A (WTB-OEA 2020) (79% of winning bidders (181 of 228) claimed eligibility for a DE bidding credit) (*Auction 105 Closing Public Notice*); *Incentive Auction of Upper Microwave Flexible Use Service Licenses in the Upper 37 GHz, 39 GHz, and 47 GHz Bands for Next-Generation Wireless Services Closes; Winning Bidders Announced for Auction 103*, AU Docket No. 19-59, Public Notice, 35 FCC Rcd 2015, 2032–34, Attach. B (WTB-OEA 2020) (46% of winning bidders (13 of 28) claimed eligibility for a DE bidding credit) (*Auction 103 Closing Public Notice*); *Auction of 24 GHz Upper Microwave Flexible Use Service Licenses Closes*, AU Docket No. 18-85, Public Notice, 34 FCC Rcd 4294, Attach. A (WTB-OEA 2019) (52% of winning bidders (15 of 29) claimed eligibility for a DE bidding credit) (*Auction 102 Closing Public Notice*); *Winning Bidders Announced for Auction of 28 GHz Upper Microwave Flexible Use Service Licenses (Auction 101)*, AU Docket No. 18-85, Public Notice, 34 FCC Rcd 4279, Attach. A (WTB-OEA 2019) (64% of winning bidders (21 of 33) claimed eligibility for a DE bidding credit) (*Auction 108 Closing Public Notice*); *Incentive Auction Closing and Channel Reassignment Public Notice*, AU Docket No. 14-252, Public Notice, 32 FCC Rcd 2786, Attach. B (IATF-MB-WTB 2017) (76% of winning bidders (38 of 50) claimed eligibility for a DE bidding credit) (*Broadcast Incentive Auction Closing Public Notice*).

[65] Not considering the later disqualification of Northstar and SNR, the percentage of applicants qualifying to bid in Auction 97 that claimed DE status was 53%. *Auction of Advanced Wireless Services (AWS-3) Licenses; 70 Bidders Qualified to Participate in Auction 97*, AU Docket No. 14-78, Public Notice, 29 FCC Rcd 13465, 13477–80, Attach. A. (WTB 2014). *See Auction of Flexible-Use Licenses in the 2.5 GHz Band for Next-Generation Wireless Services; 82 Applicants Qualified to Bid in Auction 108*, AU Docket No. 20-429, Public Notice, 37 FCC Rcd 7862, 7876–80, Attach. A (WTB-OEA 2022) (76% of qualified bidders (62 of 82) claimed eligibility for a DE bidding credit); *Auction of Flexible-Use Service Licenses in the 3.45–3.55 GHz Band for Next-Generation Wireless Services; 33 Applicants Qualified to Bid in Auction 110*, AU Docket No. 21-62, Public Notice, 36 FCC Rcd 13638, 13652–53, Attach. A (WTB-OEA 2021) (67% of qualified bidders (22 of 33) claimed eligibility for a DE bidding credit);

(continued….)

the part 1 rule modifications adopted in 2015 serve the public interest by using bidding preferences to ensure that small businesses and rural telephone companies are given the opportunity to participate in the provision of spectrum-based services.[66] Accordingly, we decline to conduct future auctions of AWS-3 spectrum licenses, including Auction 113, using the outdated rules that are no longer in effect.

25. We are not persuaded by arguments that the Commission may not use competitive bidding rules, including DE eligibility requirements, that differ from those used in Auction 97.[67] EchoStar and Council Tree assert that the use of the current competitive bidding rules and procedures, as amended, for the upcoming AWS-3 auction would undermine robust participation by DEs.[68] This claim is rooted in their fear that the DE eligibility rules we adopt today would reduce the winning net bids in Auction 113 and thereby increase the amount of Northstar's and SNR's deficiency payment.[69] We find that argument unavailing.

26. As an initial matter, all auctions conducted since 2015 have been conducted under the updated rules in effect at the time, including the increased gross revenue thresholds we adopt today for the AWS-3 service-specific rules. These rules have led to robust participation by small entities and rural providers.[70] We find that their use in Auction 113 is likely to expand the pool of entities that can potentially qualify for DE bidding credits while still allowing the Commission to "prevent[] the unjust enrichment of entities that would be ineligible to receive DE benefits in their own right."[71]

27. The Commission has, from time to time, updated its auction rules to promote the efficient assignment of spectrum licenses, promote economic opportunity and competition, ensure that innovative technologies can be brought to market, and encourage auction participation by small businesses and rural providers.[72] As demonstrated by the outcomes of auctions held since Auction 97, the reforms adopted in

---

(Continued from previous page)

*Auction of Flexible Use Service Licenses in the 3.7–3.98 GHz Band; 57 Applicants Qualified to Bid in Auction 107*, AU Docket No. 20-25, Public Notice, 35 FCC Rcd 12829, 128, Attach. A (WTB-OEA 2020) (70% of qualified bidders (40 of 57) claimed eligibility for a DE bidding credit); *Auction of Priority Access Licenses for the 3550–3650 MHz Band; 271 Applicants Qualified to Bid in Auction 105*, AU Docket No. 19-244, Public Notice, 35 FCC Rcd 6672, 6685–99, Attach. A (WTB-OEA 2020) (78% of qualified bidders (211 of 271) claimed eligibility for a DE bidding credit); *Incentive Auction of Upper Microwave Flexible Use Service Licenses in the Upper 37 GHz, 39 GHz, and 47 GHz Bands for Next-Generation Wireless Services*, AU Docket No. 19-59, Public Notice, 34 FCC Rcd 9626, Attach. A (WTB-OEA 2019) (49% of qualified bidders (17 of 35) claimed eligibility for a DE bidding credit); *Auction of 24 GHz Upper Microwave Flexible Use Service Licenses for Next Generation Wireless Services*, AU Docket No. 18-85, Public Notice, 34 FCC Rcd 933, Attach. A (WTB-OEA 2019) (45% of qualified bidders (17 of 38) claimed eligibility for a DE bidding credit); *Auction of 28 GHz Upper Microwave Flexible Use Service Licenses for Next Generation Wireless Services*, AU Docket No. 18-85, Public Notice, 33 FCC Rcd 10968, Attach. A (WTB-OEA 2018) (60% of qualified bidders (24 of 40) claimed eligibility for a DE bidding credit); *62 Applicants Qualified to Bid in the Forward Auction (Auction 1002) of the Broadcast Incentive Auction*, AU Docket No. 14-252, Public Notice, 31 FCC Rcd 7628, 7640, Attach. A (77% of qualified bidders (48 of 62) claimed eligibility for a DE bidding credit).

[66] 47 U.S.C. § 309(j)(4)(D).

[67] *See* EchoStar Corporation Comments at 1 (EchoStar); Council Tree Investors, Inc. Comments at 9–12 (Council Tree) (arguing that replicating Auction 97 rules for Auction 113 is "sound public policy" and using "new" rules "contravenes basic legal tenets").

[68] *See* EchoStar Comments at 1–2 (advocating for the use of Auction 97 competitive bidding rules, arguing that those particular rules facilitated robust participation and competition through attracting bidders claiming eligibility for designated entity DE bidding credits); Council Tree Comments at 12–13 (asserting that competition from designated entities was key to the success of Auction 97).

[69] *See* Echostar Comments at 4; Council Tree Comments at 6.

[70] *See supra* note 65.

[71] *Updating Part 1 Report and Order*, 30 FCC Rcd 7493 at 7496–97, para. 6.

2015 have served this purpose. We therefore affirm that the updated rules will govern the conduct of Auction 113. As is our standard practice when adopting auction rules, and as we did in advance of Auction 97, we also give notice to potential auction participants that future auctions will be subject to any modifications that the Commission may adopt for its part 1 general competitive bidding rules in the future.[73]

## B. Updating Eligibility Criteria for Small and Very Small Business Bidding Credits for Auctions of AWS-3 Spectrum Licenses

28.　　We adopt the *NPRM*'s proposal to update the AWS-3 service specific competitive bidding rules to align the gross revenue thresholds used to determine eligibility for small and very small business bidding credits with the DE eligibility requirements contained in the part 1 rules and the requirements of the SBREA.[74] For purposes of DE eligibility, a small business is defined as an entity that, together with its affiliates, its controlling interests and the affiliates of its controlling interests, has average gross revenues that are not more than $55 million for the preceding five years, and a very small business is an entity that, together with its affiliates, its controlling interests and the affiliates of its controlling interests, has average gross revenues that are not more than $20 million for the preceding five years. This change will bring the DE eligibility requirements for AWS-3 services in line with the Commission's standardized schedule for small business bidding credits in part 1, subpart Q.[75]

29.　　In accordance with the schedule of DE bidding credits set forth in part 1, a qualifying small business will continue to be eligible for a bidding credit of 15% and a qualifying very small business will be eligible for a bidding credit of 25%, subject to the bidding credit cap specified in section 1.2110(f)(2)(ii) of the Commission's rules.[76] The changes to the annual gross revenue thresholds we adopt today are summarized in the table below.

---

(Continued from previous page)

[72] *See Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures* , WT Docket No. 05-211, Second Report and Order and Second Further Notice of Proposed Rule Making, 21 FCC Rcd 4752, 4756, para. 8 (2006) ("The changes in the Commission's designated entity rules over time have been the result of the Commission's continuing effort to maintain this balance [of statutory goals] effectively in the face of a rapidly evolving telecommunications industry, legislative changes, judicial decisions, and the demand of the public for greater access to wireless services.") (footnote omitted); *Amendment of Part 1 of the Commission's rules – Competitive Bidding Procedures*, WT Docket No. 97-82, Order on Reconsideration of the Third Report and Order, Fifth Report and Order, and Fourth Further Notice of Proposed Rulemaking, 15 FCC Rcd 15293, 15293, para. 1 (2000) (modified by Erratum, DA 00-2475 (rel. Nov. 3, 2000) ("This *Order . . .* clarifies and amends our general competitive bidding rules for all auctionable services. These modifications are intended to increase the efficiency of the competitive bidding process and provide more specific guidance to auction participants.") (footnote omitted).

[73] As already noted, *supra* note 55, the Commission currently is considering a proposal to a require auction applicants to make certain certifications as to whether they are owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary. *See Foreign Adversary NPRM.* If such a rule were to be adopted and made effective prior to the deadline for submitting an application to participate in Auction 113, the new requirement could apply to Auction 113 applicants.

[74] *See NPRM* at 4–5, paras. 10–14.

[75] *See* 47 CFR § 1.2110(f)(2)(i)–(ii).

[76] *See id.*

|  | Former AWS-3 Small Business Definitions (used for Auction 97) | Updated AWS-3 Small Business Definitions Adopted Today |
|---|---|---|
| "Small business" (15% bidding credit) | $40 million in average gross revenues over the preceding three years | $55 million in average gross revenues over the preceding five years |
| "Very small businesses" (25% bidding credit) | $15 million in average gross revenues over the preceding three years | $20 million in average gross revenues over the preceding five year |

30. The eligibility requirements that we adopt today harmonize the AWS-3 DE rules with both the part 1 standardized schedule of DE bidding credits and the amended Small Business Act's current five-year average gross receipts benchmark. By updating the AWS-3 DE eligibility requirements to match the requirements that have been used for all other auctions of 5G-ready services since 2015, we provide small businesses and rural service providers with a simple, consistent, and predictable avenue for facilitating access to capital, thereby increasing participation and competition in an AWS-3 auction.[77]

31. In all auctions of licenses likely to be used to provide 5G services in a variety of bands since the part 1 schedule of bidding credits was updated in 2015, the Commission has consistently used the DE business size standards that we adopt today, as modified by this Order.[78] That is, the Commission has used the two larger average gross revenue thresholds and associated bidding credits in the part 1 schedule of bidding credits.[79] The results from these auctions demonstrate that using the two larger size standards to assign bidding credits has provided a real opportunity for bidders claiming eligibility as small businesses to win licenses to provide spectrum-based services at auction.[80] By adopting average annual gross revenue thresholds that are not too high, and thus not overly inclusive, we preserve the effectiveness of DE benefits for the small businesses that are intended to benefit from our DE rules. This proposal

---

[77] *See, e.g.*, *Facilitating Shared Use in the 3100–3550 MHz Band*, WT Docket No. 19-348, Second Report and Order, Order on Reconsideration, and Order of Proposed Modification, 36 FCC Rcd 5987, 6039, para. 146 (2021) (use of the part 1 small business tiers and associated bidding credits provides consistency and predictability for small businesses) (*3.45 GHz Second Report and Order*); *see also Updating Part 1 Report and Order*, 30 FCC Rcd at 7572, para. 80 (noting the benefit of establishing the part 1 schedule to inform the setting of service-by-service eligibility requirements).

[78] 47 CFR § 27.1301(a), (c)(1) (600 MHz Service); *id*. § 27.1601(a) (3.45 GHz Service); *id.* § 27.1402(a) (3.7 GHz Service); *id.* § 27.1219(a–b) (Educational Broadband Service); *id.* § 30.302(a–b) (Upper Microwave Flexible Use Service); *id.* § 96.30(a), (c)(1) (Citizens Broadband Radio Service).

[79] 47 CFR § 1.2110(f)(2)(i)(B–C).

[80] *See* 47 U.S.C. § 309(j)(4)(D) (bidding preferences for small businesses used to create opportunities to participate in the provision of spectrum-based services); *see also Auction 108 Closing Public Notice*, 37 FCC Rcd at 10128–133, Attach. A (22 of 63 winning bidders claimed eligibility for small business bidding credits); *Auction 110 Closing Public Notice*, 37 FCC Rcd at 320–322, Attach. A (six of 23 winning bidders claimed eligibility for small business bidding credits); *Auction 107 Closing Public Notice*, 36 FCC Rcd at 4329–32 (two of 21 winning bidders claimed eligibility for small business bidding credits); *Auction 105 Closing Public Notice*, 35 FCC Rcd at 9299–9317, Attach. A (113 out of 228 winning bidders claimed eligibility for small business bidding credits*); Auction 103 Closing Public Notice*, 35 FCC Rcd at 2032–34, Attach. B (five of 28 winning bidders claimed eligibility for small business bidding credits); *Auction 102 Closing Public Notice*, 34 FCC Rcd 4294, Attach. A (six of 29 winning bidders claimed eligibility for small business bidding credits); *Auction 101 Closing Public Notice*, 34 FCC Rcd 4279, Attach. A (six of 33 winning bidders claimed eligibility for small business bidding credits); *Broadcast Incentive Auction Closing Public Notice*, 32 FCC Rcd 2786, Attach. B (15 of 50 winning bidders for 600 MHz licenses claimed eligibility for small business bidding credits).

received strong support in the record, with the majority of commenters, including those representing small and rural interests, generally supporting raising the average annual gross revenue thresholds as proposed in the *NPRM*.[81]

32. We also adopt our proposals to amend the AWS-3 competitive bidding rules to reflect the five-year benchmark mandated by the amended Small Business Act.[82] Adopting this benchmark will bring the AWS-3 competitive bidding rules into alignment with the Small Business Act, as we have done for all other service specific designated entity requirements since 2019.[83] Simultaneously, we adopt our proposal to codify this requirement in its part 1 standardized schedule of bidding credits such that eligibility for small business bidding credits would be based on an entity's average gross revenues for the preceding five years.[84] We find that this modification to the part 1 standardized schedule of bidding credits will ensure consistency with the requirements of the Small Business Act in spectrum bands that may be subject to competitive bidding in the future, and we adopt the proposal. Few commenters addressed this proposal, and those that did, supported it.[85]

33. One commenter asks the Commission to go beyond its proposal and increase the eligibility threshold beyond the existing part 1 rules.[86] That commenter does not propose any specific thresholds or provide a justification for why auctions of licenses for the AWS-3 spectrum in the Commission's inventory should be treated differently than other auctions for licenses likely to be used to provide 5G services. Based on the Commission's prior experience with bidding credits in spectrum auctions and the lack of service-specific justifications in the record, we are not persuaded that we should adopt small business size standards for AWS-3 spectrum that differ from those used in auctions for other 5G-ready services.

34. Finally, we decline to increase the bidding credit percentages for small businesses and very small businesses and decline to include the 35% bidding credit from our part 1 standardized schedule of bidding credits for entities with not more than $4 million in average annual gross revenues.[87] When determining the amount of bidding credits and who should be eligible for them, we take care to avoid "expanding the scope of DE benefits to a level that may incentivize gamesmanship."[88] The Commission

---

[81] *See* Rural Wireless Association, Inc. Comments at 1 (RWA); Blooston Rural Carriers Comments at 2–3 (Blooston); Competitive Carriers Association Comments at 2 (CCA); WISPA – The Association for Broadband Without Boundaries Comments Reply at 3–4 (WISPA); *see also* Kelly Moore, Aubry Moore, Brennan Moore, and Harlan Moore Comments (the Moores) (indicating that the rules should be revised as proposed). The Moores also advise that rules regarding secondary spectrum markets and personal data should be enforced, which is beyond the scope of this proceeding. *Id.*

[82] *NPRM* at 5, para. 14.

[83] *See, e.g.,* 47 CFR § 27.1219(a); *Transforming the 2.5 GHz Band*, WT Docket No. 18-120, Report and Order, 34 FCC Rcd 5446, 5478-79, para. 89 (2019).

[84] *NPRM* at 6, para. 17.

[85] *See* Blooston Comments at 3; RWA Comments at 3; CCA Comments at 3, n.27; WISPA Comments at 3.

[86] CCA Comments at 5–6. *See* Letter from Angela Simpson, General Counsel/SVP Legal and Regulatory Affairs and Alexandra Mays, Assistant General Counsel & Directory, Regulatory Affairs, Competitive Carriers Association, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 25-70, 25-71, 13-185, AU Docket No. 25-117 (filed July 16, 2025).

[87] *Id.* at 6–7 (proposing that the Commission should increase small business bidding credit amounts to 25% for small businesses and 50% for very small businesses); WISPA Reply at 4 (supporting CCA's proposal to increase small business bidding credit amounts); WISPA Comments at 2–3 (advocating for the Commission to adopt a 35% bidding credit for entities with no more than $4 million in average annual gross revenues).

[88] *Updating Part 1 Report and Order*, 30 FCC Rcd at 7527, para. 80 (declining to adopt increases to the bidding credit percentages).

has consistently used only the two largest DE business size standards and associated bidding credits outlined in its part 1 rules when adopting service-specific rules for competitive bidding for spectrum licenses, including in Auction 97.[89]  This approach has facilitated the successful participation of many eligible small businesses in Commission auctions over the last decade and has provided uniformity and predictability for designated entities and other bidders as well.[90]  We are not persuaded by the limited record before us that AWS-3 spectrum is different in a way that warrants deviating from the rule frameworks that have governed previous auctions.[91]  We find that the bidding credit percentages and thresholds in the part 1 size standards continue to "provide a simple, consistent, and predictable avenue for facilitating small business participation in auctions."[92]

## C.    Rural Service Provider Bidding Credits for Future Auctions of AWS-3 Spectrum Licenses

35.    Consistent with the findings in the *Updating Part 1 Report and Order* and our approach in other bands where the spectrum is likely to be used to provide 5G services,[93] we adopt our proposal to offer a 15% bidding credit to a rural service provider, as defined in section 1.2110(f)(4)(i) of the Commission's rules and subject to the bidding credit cap defined in section 1.2110(f)(4)(ii) of the Commission's rules, that has not claimed a small business bidding credit.[94]  Those commenters that addressed this proposal generally supported extending bidding credits to rural service providers in auctions of licenses for AWS-3 spectrum.[95]  Permitting bidders to claim a rural service provider bidding credit in Auction 113, a bidding credit that was not available when this spectrum was initially auctioned, will allow a diversity of service providers to compete more effectively for spectrum licenses in rural areas.  We find that adopting this bidding credit will promote robust participation in Auction 113.

36.    Some commenters advocate for increasing the bidding credit percentage for rural service providers so that it matches the percentage provided to very small businesses, generally reasoning that more small businesses will be eligible for the larger bidding credit given the new thresholds we adopt, in addition to new entrants.[96]  As with calls to increase the bidding credit percentages for small business designated entities, the commenters advocating to increase the bidding credit percentage for rural service providers fail to demonstrate that services particular to the limited number of licenses being auctioned in

---

[89] *See Service Rules for Advanced Wireless Services H Block— Implementing Section 6401 of the Middle Class Tax Relief and Job Creation Act of 2012 Related to the 1915–1920 MHz and 1995–2000 MHz Bands*, WT Docket No. 12-357, Report and Order, 28 FCC Rcd 9483, 9580–81, para. 260 (2013); *AWS-3 2014 Report and Order*, 29 FCC Rcd at 4680–81, para. 189 (deciding to follow the model of other services with respect to DE bidding credits for AWS-3).  *See also* 47 CFR § 27.1301(a)(1–2) (service rules for the 600 MHz band auction); *id.* § 27.1601(a)(1)(i–ii) (3.45 GHz Service); *id.* § 27.1402 (3.7 GHz Service); *id.* § 27.1219(b) (Educational Broadband Service); *id.* § 96.30(c)(1) (Citizens Broadband Radio Service).

[90] *See supra* notes 64, 65, and 81.

[91] The Commission also, on more than one occasion, has rejected unsupported requests by WISPA that it add a third tier of bidding credits in other spectrum bands.  *See Transforming the 2.5 GHz Band Order*, Report and Order, WT Docket No. 18-120, 34 FCC Rcd 5446, 5479, para. 89, n.259 (2019); *Promoting Investment in the 3550–3700 MHz Band*, GN Docket No. 17-258, 33 FCC Rcd 10598, 10646, para. 88, n.348 (2018).  As in the past, WISPA has failed to provide the necessary justification of why a third tier of bidding credits is warranted.

[92] *Updating Part 1 Report and Order*, 30 FCC Rcd at 7528, para. 82.

[93] *See* 47 CFR § 27.1300(b), (c)(2) (600 MHz Service); *id.* § 27.1601(b) (3.45 GHz Service); *id.* § 27.1402(b) (3.7 GHz Service); *id.* § 27.1219(c) (Educational Broadband Service); *id.* § 30.302(c) (Upper Microwave Flexible User Service); *id.* § 96.30(b), (c)(2) (Citizens Broadband Radio Service).

[94] *NPRM* at 5, para. 15.

[95] Blooston Comments at 3; CCA Comments at 2; RWA Comments at 2; WISPA Comments at 3.

[96] *See* Blooston Comments at 3–4; CCA Comments at 7–8; WISPA Reply at 4–5.

the AWS-3 band would materially benefit from a larger rural service provider bidding credit. We see nothing in the record that disturbs the Commission's conclusion when it adopted a rural service provider credit that "rural service providers generally have greater access to capital and infrastructure than other small businesses or new entrants," making it appropriate for the rural service provider credit to equal the smallest credit amount available to a small business.[97]

37.     Our past experience with the rural service provider bidding credit indicates that the existing part 1 rural service provider bidding credit achieves an appropriate balance of the statutory obligations that the Commission is charged with pursuing, while sufficiently enabling rural service providers to compete for spectrum licenses.[98] Thus, we confirm that the part 1 rural service provider bidding credit standard will apply for auctions of licenses for AWS-3 spectrum as proposed in the *NPRM*.[99]

## IV.     THE COMMISSION IS NOT REQUIRED TO USE THE 2014 COMPETITIVE BIDDING RULES FOR AUCTION 113 IN 2025

38.     As discussed above, the Commission will conduct Auction 113 under the part 1 competitive bidding rules in effect at the time of the auction, and not part 1 rules that were in effect during Auction 97. As the *NPRM* observed, when establishing the AWS-3 service ahead of Auction 97, the Commission "specified that such licenses would be subject to competitive bidding and that the competitive bidding procedures contained in part 1 of the Commission's rules would apply, unless otherwise specified."[100] The current part 1 rules include improvements related to DEs that were adopted in the wake of Auction 97.[101] As discussed above, the Commission's longstanding part 1 rules have led to robust participation by small entities and rural providers. Notwithstanding the assertions of EchoStar and Council Tree, nothing in the language of the *AWS-3 2014 Report and Order* or the part 27 rules indicates that the part 1 rules used in Auction 97 must be used to conduct any and all future auctions of licenses for AWS-3 spectrum.

39.     Under the Commission's rules, any auction involving AWS-3 licenses will be governed by the "general competitive bidding procedures set forth 47 CFR part 1, subpart Q."[102] Neither EchoStar nor Council Tree addresses the straightforward application of the text of these rules. Instead, they claim

---

[97] *Updating Part 1 Report and Order*, 30 FCC Rcd at 7538, para. 107.

[98] *See* Blooston Comments at 4 ("Results of recent FCC auctions show that the [rural service provider] bidding credit has been effective in facilitating the acquisition of commercial wireless licenses by rural telephone companies, cooperatives, and groups of these entities."). *See also Auction 108 Closing Public Notice*, 37 FCC Rcd at 10128–133, Attach. A (27 of 63 winning bidders claimed eligibility for rural service provider bidding credits); *Auction 110 Closing Public Notice*, 37 FCC Rcd at 320–22, Attach. A (seven of 23 winning bidders claimed eligibility for rural service provider bidding credits); *Auction 107 Closing Public Notice*, 36 FCC Rcd at 4329–32 (nine of 21 winning bidders claimed eligibility for rural service provider bidding credits); *Auction 105 Closing Public*, 35 FCC Rcd at, 9299–9317, Attach. A (68 out of 228 winning bidders claimed eligibility for rural service provider bidding credits*); Auction 103 Closing Public Notice*, 35 FCC Rcd at 2032–34, Attach. B (eight of 28 winning bidders claimed eligibility for rural service provider bidding credits); *Auction 102 Closing Public Notice*, 34 FCC Rcd 4294, Attach. A (WTB-OEA 2019) (nine of 29 winning bidders claimed eligibility for rural service provider bidding credits); *Auction 101 Closing Public Notice*, 34 FCC Rcd 4279, Attach. A (WTB-OEA 2019) (15 of 33 winning bidders claimed eligibility for rural service provider bidding credits); *Broadcast Incentive Auction Closing Public Notice*, 32 FCC Rcd 2786, Attach. B (23 of 50 winning bidders for 600 MHz licenses claimed eligibility for rural service provider bidding credits).

[99] *NPRM* at 5, para. 15.

[100] *Id*. at 2, para. 5 (citing *AWS-3 2014 Report and Order* and 47 CFR § 27.1105).

[101] *See generally Updating Part 1 Report and Order*, 30 FCC Rcd 7493.

[102] 47 CFR § 27.1105. *See AWS-3 2014 Report and Order*, 29 FCC Rcd at 4675–76, paras. 177 and 179; *Auction 97 Procedures Public Notice*, 29 FCC Rcd at 8404, para. 49.

that Auction 113 will be a continuation of Auction 97 and therefore the Commission must continue to use the 2014 part 1 rules in future AWS-3 auctions, including Auction 113.[103] In an attempt to marry Auction 113 to Auction 97, Council Tree interprets the words "subsequent auction" and "re-auction," that appear in the Commission's rules regarding the consequences of an auction default, to require an "inextricable link" between the first auction and the second.[104]

40. In reality, these phrases mean the opposite of what Council Tree asserts. The terms "subsequent auction" and "re-auction," on their face, refer to a new auction that will offer licenses for spectrum that has been offered but not successfully assigned in a prior auction.[105] In all material respects, Auction 97 has concluded: the Commission has completed the process of competitive bidding, issued licenses to all winning bidders, finished the transition process, and accomplished all other prerequisites to the provision of wireless service for licenses that were successfully auctioned. Bidding in Auction 97 concluded more than a decade ago. The Commission's default rules rely on bids in two auctions of licenses for the same spectrum to determine the consequences of a default in the first one, but this does not suggest that the second auction is a continuation of the first. The Commission is entitled to set the rules of each auction within its statutory parameters. By using the updated part 1 rules, the Commission is able to leverage experience and expertise that it did not have at the time of Auction 97—and indeed leverage its experience in Auction 97 itself—to better promote robust competition and combat fraud in Auction 113.

### A. Applying the Current Part 1 Competitive Bidding Rules in Auction 113 is Not a Violation of Due Process

41. Using the part 1 rules in effect at the time of future AWS-3 auctions is consistent with applicable law and the reasonable expectations of any party involved in Auction 97. Applying current part 1 rules in future AWS-3 auctions is consistent with due process of law. Application of the Commission's rules at the time of the auction is neither a prohibited primary retroactive application nor secondary retroactive application of the rules. Furthermore, EchoStar's contention that changes in rules applicable to Auction 97 and a future AWS-3 auction effectively single out the defaulters in Auction 97 for differential treatment ignores their own legal responsibility as defaulters.

42. *Primary retroactivity.* An agency order is impermissible as "primarily retroactive" if it "alters the *past* legal consequences of past actions."[106] An order can be primarily retroactive if it (1) "increase[s] a party's liability for past conduct"; (2) "impair[s] rights a party possessed when he acted"; or (3) "impose[s] new duties with respect to transactions already completed."[107]

---

[103] EchoStar Comments at 15; Council Tree Comments at 5–6.

[104] Council Tree Comments at 5. Council Tree further attempts to relitigate arguments it presented with respect to the Commission's competitive bidding rules for designated entities that were adopted in 2015, over the objections and arguments by Council Tree. It also repeats many of these arguments in the proceeding to adopt rules for Auction 113. *See* Council Tree Comments, AU Docket No. 25-117, at 3 n.5 (rec. Apr. 11, 2025) (attaching and citing its own comments in response to the *NPRM* "incorporating [Council Tree Investor's] May 14, 2015 Comments filed in WT Docket No. 14-170 et al."). Arguments regarding the Commission's authority to apply particular rules are best addressed in this proceeding, while the details of auction-specific procedures are best addressed in the auction procedures proceeding.

[105] *See* 47 C.F.R. §§ 1.2104(g) ("subsequent auction"), 1.2109(b)–(c) ("re-auction").

[106] *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring) (emphasis in original)).

[107] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

43. Applying part 1 rules in effect at the time of Auction 113 will not alter "the past legal consequences for past actions" taken by Northstar and SNR.[108] To the contrary, the "past legal consequences of past actions" by Northstar and SNR are determined by the Commission's rules governing default penalties, which were well established prior to Action 97 and have not changed in any meaningful way since then.[109] It is those rules, not the DE rules, that determines a defaulter's liabilities, rights, and duties.

44. As such, applying part 1 rules in effect when Auction 113 commences would not "increase [DISH's] liability for past conduct" by penalizing Northstar and SNR "in the form of a larger deficiency payment owed than if the Auction 97 DE rules remained in place."[110] The Commission's default payment rules determine the amounts of Northstar's and SNR's default payment obligations or, in other words, the default payment rules establish the liabilities applicable to the defaulters. Pursuant to the rules, a bidder's obligation to pay its entire bid amount is set when its bid is accepted, and after default the amount due may be reduced based on the results of a later auction.[111] The amount that a defaulter will ultimately owe is determined by the delta between its winning bid and the winning bid in a subsequent auction, and "[i]f the subsequent winning bid . . . equals or exceeds the defaulted bid, no deficiency payment will be assessed."[112] The bidding rules that are applied in a subsequent auction would not "increase [DISH's] liability for past conduct" because the maximum amount of the liability due to its past conduct was established at the time DISH defaulted, and the Commission's rules controlling default payments have not changed.[113] Accordingly, using those rules in a future AWS-3 auction would not "increase [DISH's] liability for past conduct."[114]

---

[108] *Mobile Relay Assocs.*, 457 F.3d at 11 (rejecting challenge that Commission's rebanding rules were primarily and secondarily retroactive as to existing 800 MHz Specialized Mobile Radio licensees).

[109] In one instance, a defaulting winning bidder in Auction 35 had related default payments assessed after Auctions 58, 71, and 78, respectively. *See Final Default Payment for Auction 35 License CW-BTA 127-C1 (Elmira-Corning-Hornell, NY)*, Letter Order, 25 FCC Rcd 16888 (WTB-ASAD 2010) (assessing payments based on subsequent winning bid in Auction 78); *Final Default Payment for Auction No. 35*, Letter Order, 22 FCC Rcd 16251 (WTB-ASAD 2007) (assessing payments based on subsequent winning bid in Auction 71); *Final Default Payment for Auction No. 35*, Letter Order, 20 FCC Rcd 10975 (WTB-ASAD 2005) (assessing payments based on subsequent winning bids in Auction 58). Furthermore, the application of the rule at times relieved the defaulting bidder of any further liability. *See Final Default Payment for Auction No. 35*, Letter Order, 20 FCC Rcd 10971 (WTB-ASAD 2005) (subsequent winning bid in Auction 58 exceeded the defaulted bid in Auction 35, resulting in no deficiency payment obligation). And, of course, the rule was not limited only to defaults in Auction 35. *See, e.g.*, *Final Default Payment for Fifteen Auction 40 Licenses CP-BEA084-FA (Baton Rouge, LA-MS); CP-BEA087-FA (Beaumont-Port Arthur, TX); CP-BEA127-FA (Dallas-Fort Worth, TX-AR-OK); CP-BEA129-FA (San Angelo, TX); CP-BEA129-FB (San Angelo, TX); CP-BEA129-FC (San Angelo, TX); CP-BEA129-FD (San Angelo, TX); CP-BEA129-FE (San Angelo, TX); CP-BEA130-FA (Austin-San Marcos, TX); CP-BEA134-FA (San Antonio, TX); CZ-MEA031-AA (Houston); CZ-MEA031-AJ (Houston); CA-MEA031-AK (Houston); CZ-MEA031-AV (Houston); CZ-MEA038-AV (San Antonio)*, Letter Order, 27 FCC Rcd 2845 (WTB-ASAD 2012) (assessing final default payments for defaults in Auction 40).

[110] *Landgraf*, 511 U.S. at 280; EchoStar Comments at 21. We note that EchoStar argues only that using the updated part 1 rules in Auction 113 is primarily retroactive on this ground. *See* EchoStar Comments at 19–23.

[111] 47 CFR § 1.2104(g)(2) ("[a] bidder assumes a binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction").

[112] *Id*. § 1.2104(g)(2)(i). In addition to the deficiency portion of its obligation, a defaulting bidder also owes an additional payment, calculated based on the lower bid amount used in determining the deficiency portion. *Id*. § 1.2104(g)(2)(ii).

[113] *Landgraf*, 511 U.S. at 280.

[114] *Id.* EchoStar and Council Tree also rely on an out-of-context statement from *Mountain Solutions*: "Mountain Solutions' position[,] that it should not be liable for a default penalty created in part by the Commission's decision

(continued….)

45.    *Secondary Retroactivity.*  EchoStar further claims that conducting Auction 113 using the part 1 rules that are in effect at that time would have secondary retroactive effect, making their use impermissible.  A change in law that does not result in primary retroactivity nonetheless "can still be impermissibly secondarily retroactive."[115]  "This sort of retroactivity" is "characteristic of a rule having exclusively 'future effect' but affect[s] the desirability of past transactions."[116]  However, simply having an effect, even if negative, on expectations based on past rules does not make a new rule secondarily retroactive.

46.    As a preliminary matter, EchoStar could not reasonably rely on a future AWS-3 auction replicating Auction 97, with respect to rules or outcome.  At the outset of the AWS-3 service, the Commission gave notice that future AWS-3 auctions would rely on the part 1 rules then in effect, meaning that Northstar and SNR never could have relied upon the Auction 97 rules being applied in perpetuity.[117]  The Commission expressly admonished bidders that any future auction of AWS-3 spectrum, which would determine subsequent winning bid amounts for purposes of default obligations, could be subject to updated rules.  Participants in Auction 97 were on notice of potential for changes in the Commission's competitive bidding rules, and they reasonably should have expected the Commission to update or modernize its rules in an auction being held over a decade later.[118]  It would be irresponsible for the Commission to ignore the vast changes involving spectrum-based services since Auction 97.[119]  As

(Continued from previous page) ─────────────────

to change the rules for reauction after Mountain Solutions had been a successful bidder under a prior regime, has some persuasive force."  *See Mountain Solutions v. FCC*, 197 F.3d 512, 523 (D.C. Cir. 1999); Council Tree Comments at 9; EchoStar Comments at 17–18.  At the outset, that statement is dicta.  As the court pointed out, it "ha[d] yet to hear from the Commission," *id.*, because no default payment had yet been assessed.  Beyond that, neither Council Tree nor EchoStar shows how this sentence supports their argument that applying the current part 1 rules in Auction 113 will be impermissibly retroactive.  That is likely because *Mountain Solutions* did not involve a retroactivity claim.  Rather, the issue there was whether the Commission had abused its discretion in denying the petitioner's request to waive the petitioner missing a payment deadline, which caused the petitioner to be in default on its winning bids in a spectrum auction and, as a consequence, potentially to incur default payments.  *See Mountain Solutions*, 197 F.3d at 518–19.  The petitioner there argued (among other things) that it was "inequitable" for the Commission to enforce the payment rule against it because the agency "ha[d] granted a de facto waiver" to other bidders.  *See id.* at 523.  Thus, the statement that Council Tree and EchoStar rely on signals, at most, a concern about perceived unfairness.  There is no fairness-related issue here because Northstar and SNR were the only defaulters in Auction 97.

[115] EchoStar Comments at 23.

[116] *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 589 (D.C. Cir. 2001).

[117] *See AWS-3 2014 Report and Order*, 29 FCC Rcd at 4675–76, paras. 177 and 179.

[118] For the same reason, there is no merit to Council Tree's argument that the Commission failed to provide "fair notice" that the part 1 rules in effect during Auction 97 may not apply in future auctions of AWS-3 spectrum licenses.  Council Tree Comments at 9–11.  A party has fair notice when, "by reviewing the regulations and other public statements issued by the agency," it can "identify, with ascertainable certainty, the standards with which the agency expects parties to conform."  *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (internal quotation marks and citation omitted).  The *AWS-3 2014 Report and Order* and the Commission's rules gave Northstar and SNR (and any other bidder in Auction 97) sufficient notice that future AWS-3 auctions would rely on the part 1 rules then in effect.  *See supra* para. 22.

[119] Consider just the difference between the roughly 580 megahertz of spectrum that the Commission considered available in 2014 with the 1,123 megahertz considered available in 2024.  *See Implementation of Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless, Including Commercial Mobile Services*, WT Docket No. 13-135, Seventeenth Report, 29 FCC Rcd 15311, 15360 (2014); *Communications Marketplace Report*, 2024 Communications Marketplace Report, FCC 24-136, 2024 WL 5330303, at *32 (rel. Dec. 31, 2024).  It should be noted that the latter does not include the additional megahertz available in the millimeter wave bands.  *Id.*, 2024 WL 5330303, at *33.

the D.C. Circuit has recognized, "an agency must be allowed to adjust its policies to changing circumstances, within the framework of the rules it established in advance of the auction."[120]

47.    Moreover, the benefits of applying the revised part 1 rules in a future AWS-3 auction will outweigh the burden claimed by EchoStar.[121]  Agencies must "balance the harmful 'secondary retroactivity' of upsetting prior expectations or existing investments against the benefits of applying their rules to those preexisting interests."[122]  In 2015, the Commission updated the part 1 rules after finding that the rule amendments served the public interest, and evidence in the record shows that DE participation in Commission auctions has been enhanced by those updates.  That finding was made in part based on the experience the Commission gained from administering Auction 97—an auction in which the defaults of Northstar and SNR significantly affected the outcome.  Today's actions further align eligibility criteria for DE bidding credits for AWS-3 spectrum licenses with the Commission's part 1 rules and with the DE eligibility requirements used in auctions for 5G-ready spectrum licenses since Auction 97.  The "amorphous injury" to Northstar and SNR—i.e., a purely speculative decrease in winning bid amounts in Auction 113—is outweighed by the public interest benefits in enhancing *bona fide* DE participation in spectrum auctions and in harmonizing the competitive bidding rules.[123]  In conducting Auction 113 pursuant to the reformed part 1 rules, the Commission is "exercis[ing] its discretion to balance fairness to losing bidders with the needs of the market and the public interest."[124]  Accordingly, there is no impermissible secondary retroactivity.

48.    *Disparate Treatment*.  In support of its argument that due process requires that Auction 113 be conducted using Auction 97 part 1 rules, EchoStar complains that Northstar and SNR would be impermissibly "singled out" by the use of modified part 1 rules.[125]  This argument is unsupported and unpersuasive.  It disregards Northstar and SNR's own responsibility for improperly claiming bidding credits under the Commission's DE rules in Auction 97.  Northstar and SNR, and their guarantors, will be subject to default obligations based on their defaulted winning bids in Auction 97— bids that they won while relying on improperly claimed bidding credits—pursuant to a rule that applied to all other Auction 97 participants.  Had any other winning bidder defaulted in that auction, it would have had its final default payment determined just as Northstar's and SNR's will be.  The only thing that "singles out" Northstar and SNR is that they voluntarily defaulted on winning bids of over $3 billion in Auction 97 after improperly claiming billions in small business bidding credits.  EchoStar similarly argues that Northstar and SNR are unique in that "any bidders in future auctions outside the AWS-3 band will have fresh, revised expectations based on application of the Commission's post-Auction 97 revisions to its [p]art 1 competitive bidding rules."[126]  But this claim ignores that the Commission regularly admonishes potential auction participants that future auctions will also be subject to any modifications that the Commission may adopt for its part 1 general competitive bidding rules in the future.[127]

---

[120] *U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 235 (D.C. Cir. 2000).

[121] Though EchoStar asserts that it invested billions on various network build-out efforts "in part on the expectation that any default payment would be circumscribed to the regime governing Auction 97," that overlooks the fact that these investments were made to comply with build-out conditions and deadlines independently arising from its license holdings.  EchoStar Comments at 5.

[122] *National Cable & Telecommunications Assn., v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009).

[123] *See Celtronix Telemetry v. FCC*, 272 F.3d at 590.

[124] *U.S. Airwaves*, 232 F.3d at 236.

[125] *See* EchoStar Comments at 27.

[126] *Id.*

[127] *See supra* para. 22.

### B. The Commission Provided the Notice and Opportunity for Comment Required by the Administrative Procedure Act

49. We find no merit in Council Tree's contention that the Commission failed to comply with the APA.[128] Council Tree complains that the Commission's use of a fixed comment period from the release of the *NPRM* rather than from the date of its Federal Register publication does not meet APA requirements.[129] The APA requires that notice of regulatory action be published in the Federal Register and permits action only after such notice is provided.[130] It does not define the minimum period of notice before a deadline for comments. Commission rules state that "a reasonable time will be provided" and that such time will be "specified in the NPRM," without prescribing a specific length of time.[131]

50. The *NPRM* was adopted at the Commission Open Meeting on February 27, 2025, and was released by publication on the Commission's website on February 28, 2025. It set a deadline for comments to be filed by March 31 and for reply comments by April 14. The Federal Register published a summary of the *NPRM*, including information about the dates for comments and replies, on March 13, or 12 business days and 18 calendar days prior to the comment deadline.[132]

51. That notice satisfied the requirements of the APA and the Commission's rules and gave interested parties a sufficient opportunity to participate in the rulemaking.[133] Council Tree does not claim that the comment period was unreasonably short or that it was prejudiced in any way. In fact, Council Tree hired outside counsel and filed 18 pages of comments by the March 31 deadline. Eleven other parties filed comments within this time period, and no party claimed to have been unable to meet a filing deadline or otherwise sought additional time to address the *NPRM*.

52. We are likewise unpersuaded by Council Tree's claim that the Commission violated the APA by "fail[ing] to identify and seek any comment on any issue relating to the inextricable linkage of Auctions 97 and 113."[134] The APA requires an agency to publish a notice that identifies "either the terms or substance of the proposed rule or a description of the subjects and issues involved."[135] That notice "must be sufficient to fairly apprise interested parties of the issues involved, but it need not specify every precise proposal which [the agency] may ultimately adopt as a rule."[136] The Commission satisfied that requirement when it proposed updating the DE rules for Auction 113.

### C. Applying Part 1 Rules in Effect at the Time of Any Future AWS-3 Auctions Will Not Breach Any Contractual Duty of the Commission

53. Contrary to EchoStar's and Council Tree's assertions, changes to the competitive bidding rules do not breach the DISH guaranties.[137] EchoStar relies on a savings clause in the guaranties—a

---

[128] Council Tree Comments at 16–17 (citing 5 U.S.C. § 553(b)–(c)).

[129] *Id.*

[130] *See* 5 U.S.C. § 553(b)-(c).

[131] 47 CFR § 1.415(c).

[132] Federal Communications Commission, Competitive Bidding Rules for Auction of AWS-3 Licenses, 90 Fed. Reg. 11931 (Mar. 13, 2025).

[133] *See Omnipoint Corp v. FCC*, 78 F.3d 620, 629–30 (D.C. Cir. 1996) (finding sufficient notice when comments were due seven days after Federal Register publication, noting that the Commission issued the relevant Further Notice of Proposed Rulemaking seven days prior to Federal Register publication, after having taken related action ten days earlier, and that plaintiffs "were not harmed by the short comment period").

[134] Council Tree Comments at 8.

[135] 5 U.S.C. § 553(b)(3).

[136] *Nuvio Corp. v. FCC*, 473 F.3d 302, 310 (D.C. Cir. 2006) (alteration in original) (citation omitted).

provision that the guaranties may be enforced to "the fullest extent permissible under the laws and public policies" in the event that "and to the extent that[] the obligations of the Guarantor under this Guaranty shall be adjudicated to be invalid or unenforceable."[138] EchoStar contends that because changing the bidding credit rules from Auction 97 violates its due process rights, enforcing the guaranties would exceed the savings clause provision of "permissible" enforcement.[139] As explained above, changes in the Commission's bidding credit rules do not prejudice any rights of EchoStar protected by due process and its strained reading of the savings clause fails to prove any breach of the guaranties.

54.     EchoStar suggests that applying the part 1 competitive bidding rules in effect at the time that the auction takes place is somehow analogous to the government's actions in the *Winstar* case.[140] It is not. In that case, the Supreme Court addressed the enforcement of a regulation that contradicted contractual assurances of specific future accounting treatment that a banking regulator had made to induce healthier savings and loan companies to purchase failing financial entities.[141] EchoStar never received any contractual assurance that future AWS-3 auctions would be conducted under the Auction 97 rules, and the Commission never extended any such assurance. As already noted, to the contrary, the Commission provided notice that the Commission's competitive bidding rules would be subject to future changes.

55.     Likewise, the Commission's improvement of its competitive bidding rules does not breach any applicable covenant of good faith and fair dealing.[142] Notwithstanding claims by EchoStar or Council Tree, the underlying default obligations are set by section 1.2104(g) and those liabilities are reflected in the guaranties. The final amount of those obligations will be determined by the applicable subsequent winning bids—not by any of the changes that the Commission has made to the competitive bidding rules since Auction 97 or contemplates making now. Whatever the subsequent winning bid amounts, EchoStar remains liable for any deficiency regardless of the DE rules, or any other particular rules, in a future auction.

**D.     EchoStar's Pre-Auction Request for Post-Auction Relief Is Not Ripe**

56.     Finally, EchoStar and Council Tree request that, if it does not apply the 2014 part 1 rules in Auction 113, the Commission "refrain from requiring any deficiency payments pursuant to Section 1.2104(g) of the Commission's rules and from enforcing the DISH guaranties."[143] Obviously, the Commission has not yet assessed a final default payment for the defaulted bids from Auction 97. Indeed, the outcome of a future auction of AWS-3 spectrum licenses may prove such a request to be unnecessary if the subsequent winning bids are equal to or greater than Northstar's and SNR's prior defaulted winning bids. Thus, we decline at this time to consider EchoStar's and Council Tree's request that the Commission "refrain from requiring any deficiency payments pursuant to Section 1.2104(g) of the Commission's rules and from enforcing the DISH guaranties" if it amends the rules as proposed in the *NPRM*.[144]

(Continued from previous page) ────────────────

[137] *See* EchoStar Comments at 27–30; Council Tree Reply at 3 (endorsing EchoStar Comments).

[138] *See* EchoStar Comments at 10–11 (quoting para. 10 of each guaranty).

[139] EchoStar Comments at 28.

[140] *Id.* (citing *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934))).

[141] *See United States v. Winstar Corp.*, 518 U.S. 839 (1996).

[142] *See* EchoStar Comments at 28–29.

[143] *Id.* at 31; *see* Council Tree Reply at 3.

[144] EchoStar Comments at 31; *see* Council Tree Reply at 3.

22

57.     EchoStar's and Council Tree's request in this regard is similar to that of the petitioner in *Mountain Solutions* in that the default liability, if any, is not yet ripe.[145]  Indeed, the request here is even more premature.  In *Mountain Solutions*, there were subsequent winning bids for seven of the ten licenses involved in the petitioner's defaults.[146]  Here, by contrast, there are no subsequent winning bids with respect to the defaults by Northstar and SNR.  As WISPA observes in its reply comments, at this point, any injury related to deficiency payments and enforcement of the guaranties is speculative and, accordingly, any requests for related Commission action are premature.[147]  We therefore do not need to consider any request by EchoStar or Council Tree for relief from the obligations of SNR, Northstar, or DISH under the rules and the guaranties until after the Commission is able to calculate any final payment for the defaults.

## V.      TRIBAL LICENSING WINDOW

58.     In the *NPRM*, the Commission sought comment on the possible use of a Tribal licensing window for Auction 113.[148]  After consideration of the comments received in response, we find that it would not be in the public interest to implement a Tribal licensing window for the inventory proposed for Auction 113.

59.     In seeking comment on a possible Tribal licensing window, the Commission noted that the Spectrum and Secure Technology and Innovation Act directs the Commission to use competitive bidding to "grant licenses for spectrum in the inventory of the Commission as of the date of enactment of this Act in the bands of frequencies referred to by the Commission as the 'AWS–3 bands.'"[149]  The Act also directs proceeds from the auction to the general fund of the Treasury to, among other things, reimburse funds borrowed by the Commission to carry out the Commission's Supply Chain Reimbursement Program.[150]  The Spectrum and Secure Technology and Innovation Act also includes a directive for the Commission to "initiate systems of competitive bidding under section 309(j)" for these AWS–3 licenses within 18 months of enactment and provision to processing applications and grant licenses notwithstanding the lapse in the Commission's broader authority under section 309(j), indicating congressional urgency in moving forward with Auction 113.[151]

60.     Within this context, the Commission sought comment on whether a Tribal licensing window for any relevant portions of the limited number of AWS–3 licenses available for auction would be permissible according to the language of the statute.  Additionally, the Commission sought comment on the appropriate eligibility requirements to adopt should it offer a Tribal licensing window.  The Commission sought comment on the putative benefits of a Tribal licensing window given the bandwidth available for auction and the presence of Federal operations in the band.  Finally, the Commission sought general comment on the potential impact of a Tribal licensing window on the process for auctioning these licenses.

61.     Numerous Tribal entities and their representatives—including Tribal governments, a Tribal regulatory entity, a Tribal wireless provider, and public interest groups—filed in support of including a Tribal licensing window in Auction 113.[152]  They argued that adopting a Tribal licensing

---

[145] *See Mountain Solutions v. FCC*, 197 F.3d at 523.

[146] *Id.* at 521.

[147] WISPA Reply at 2.

[148] *NPRM* at 6–7, paras. 18–21.

[149] *Spectrum and Secure Technology and Innovation Act* § 5403.

[150] *Id.* § 5404; *see also* 47 U.S.C. § 1601 et seq.

[151] *Spectrum and Secure Technology and Innovation Act* § 5403.

[152] *See* National Congress of American Indians, et al., (NCAI) Comments; Navajo Nation Telecommunications Regulatory Commission (NNRTC) Comments; Shoshone-Bannock Tribes (SBT) Comments; Letter from Nat

(continued….)

window would serve the public interest, promote Tribal spectrum access, and support access to communications services in rural, unserved, and underserved areas.[153] In addition, a number of commenters address the eligibility criteria for a Tribal licensing window in Auction 113, referencing previous proceedings where the Commission prioritized Tribal licensing.[154] By contrast, CTIA opposes including a Tribal licensing window in Auction 113, arguing that doing so would not be consistent with the goals of the Spectrum and Secure Technology and Innovation Act, which include "auction[ing] . . . this valuable spectrum, which has already been sitting in the Commission's inventory unused for far too long."[155]

62. We find that it would not be in the public interest to implement a Tribal licensing window in the context of Auction 113, given Congress's specific directives in the Spectrum and Secure Technology and Innovation Act regarding the inventory to be licensed and the timetable for doing so.[156] Congress was clear in the Spectrum and Secure Technology and Innovation Act that the Commission is to auction all the unassigned AWS-3 spectrum in its inventory as of December 2024, and that the proceeds from the auction are ultimately to be used to reimburse the Treasury for funds deposited in the Spectrum Auction Trust Fund to fill the funding shortfall in the Supply Chain Reimbursement Program and support the removal of telecommunications equipment that poses a risk to national security.[157] What is more, the text of the Spectrum and Secure Technology and Innovation Act reflects the urgent public interest in moving expeditiously to secure American networks from equipment that poses a risk to national security, and in using proceeds from the AWS-3 spectrum auction to achieve that goal. We agree with CTIA that conducting a Tribal licensing window, which would remove spectrum prior to the auction from the congressionally specified inventory and could potentially reduce the auction proceeds available for the Supply Chain Reimbursement Program, would not further the public interest goals of the Spectrum and Secure Technology and Innovation Act.[158] Additionally, CTIA argues that an auction of AWS-3

(Continued from previous page)

Purser, Government Affairs Policy Advocate, Public Knowledge, et al. to Marlene H. Dortch, Secretary, FCC, GN Docket Nos. 25-70, 25-71, 13-185 (filed July 11, 2025); Letter from OJ Semans, Sr., COLT (Coalition of Large Tribes) Executive Director, to Brendan Carr, Chairman, FCC, GN Docket Nos. 25-59, 25-70, 13-185 (filed July 7, 2025); Letter from the United Church of Christ Media Justice Ministry, et al. to Marlene H. Dortch, Secretary, FCC, GN Docket Nos. 25-70, 25-71, 13-185 (filed Apr. 29, 2025); Letter from Michael Calabrese, Director, Wireless Future Open Technology Institute at New America and Harold Feld, Senior Vice President, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, GN Docket Nos. 25-70, 25-71, 13-185 (filed Apr. 22, 2025); Letter From Dr. Buu Nygren, President, The Navajo Nation, to Brendan Carr, Chairman, FCC, GN Docket Nos. 25-70, 25-71, 13-185, at 2 (filed Feb. 21, 2025).

[153] *See, e.g.*, NCAI Comments at 7–8; NNRTC Comments at 9–13; SBT Comments at 1–2.

[154] NNRTC Comments at 6–14; NCAI Comments at 7–8; SBT Comments at 1–2; WISPA Comments at 3–4.

[155] CTIA – The Wireless Association (CTIA) Comments at 7–8; *see* CTIA Reply at 9–11; Letter from Sarah Leggin, Vice President, Regulatory Affairs, CTIA – The Wireless Association, to Marlene H. Dortch, Secretary, FCC, GN Docket Nos. 25-70, 25-71, 13-185, at 2 (filed May 30, 2025); Letter from Sarah Leggin, Vice President, Regulatory Affairs, CTIA – The Wireless Association, to Marlene H. Dortch, Secretary, FCC, GN Docket Nos. 25-70, 25-71, 13-185, at 2 (filed July 15, 2025).

[156] CTIA also argues that Tribal licensing windows, both in general and in the context of Auction 113, are contrary to section 309(j) of the Communications Act of 1934. CTIA Comments at 6–9; CTIA Reply Comments at 4–9. Because we decline to adopt a Tribal licensing window for Auction 113, we do not reach the issue of the Commission's authority to implement Tribal licensing windows in other auctions.

[157] *See* 47 U.S.C. § 1601 et seq. NNRTC argues that it is impermissible for the Commission to base public interest findings predominantly on expected auction revenue; however, in this instance, we base our finding not on expected revenue, but rather on the public interest in fulfilling the mandate given to us by Congress in the legislation. *See* NNRTC Comments at 11 ("The Communications Act explicitly forbids basing public interest findings predominantly on expected auction revenue . . . .").

inventory licenses can still benefit Tribes.  However, there is disagreement about whether this is true.  The Navajo Nation Telecommunications Regulatory Commission counters that they "have seen too many cases where auction winners acquire licenses covering Navajo lands but do not build infrastructure . . . because it is not economically lucrative to do so, or if they do, [Navajo lands] are the very last areas built out."[159]  Although we do not adopt a Tribal priority window for Auction 113, we acknowledge the Commission's trust relationship with Tribal Nations, and we remain committed to finding ways to address the connectivity challenges facing Tribal Nations.[160]

63.    Furthermore, as CTIA suggested, conducting a Tribal licensing window in connection with Auction 113 could further delay the AWS-3 spectrum from being used to provide service.[161]  This spectrum has been in inventory for a decade now amidst protracted litigation and the subsequent lapse of the Commission's auction authority.  With the Spectrum and Secure Technology and Innovation Act, Congress provided the authority to auction these licenses and established a clear and swift timeline for moving forward.[162]  Consistent with the public benefits of this well-established service and as reflected by the legislative action, the public interest mandates prioritizing expeditious licensing.  Several commenters claim that implementing a Tribal licensing window would not delay the auction and such a window could even be held simultaneously with traditional bidding to expedite the process.[163]  We do not find these arguments compelling.  In our experience with the Tribal priority window in the 2.5 GHz auction, considerable time and resources were required in order to establish and conduct a Tribal licensing window with adequate outreach and support for potential participants.  For these same reasons, we do not find it feasible to hold a Tribal licensing window and bidding simultaneously in this proceeding.  Finally, because we decline to adopt a Tribal licensing window, we find it unnecessary at this time to evaluate the various proposals in the record regarding eligibility criteria for participation in a Tribal licensing window for Auction 113.

---

(Continued from previous page)

[158] CTIA Comments at 9.  Additionally, CTIA argues that an auction of AWS-3 inventory licenses can still benefit Tribes.  *See* CTIA Comments at 3 ("[W]ireless providers—working in partnership with Tribal governments—have made significant inroads delivering wireless broadband connectivity to Tribal communities and across Tribal lands.").  However, there is disagreement about whether this is true.  *See* NNRTC Comment at 11 ("We have seen too many cases where auction winners acquire licenses covering Navajo lands but do not build infrastructure in our communities because it is not economically lucrative to do so, or if they do, we are the very last areas built out.").

[159] NNRTC Comments at 11.

[160] The Commission's trust relationship flows from the federal government's trust responsibility to Tribal Nations.  *See Statement of Policy on Establishing a Government-to-Government Relationship with Indian Tribes*, Order, 16 FCC Rcd 4078 (2000) (recognizing that "the federal government has a trust responsibility to and a government-to-government relationship with recognized tribes"); *Memorandum of Understanding among the U.S. Dep't of Interior and the FCC and the U.S. Dep't of Commerce Nat'l Telecommunications and Information Administration* (Nov. 2022) (recognizing "the United States fiduciary trust responsibility for trust and restricted Indian lands").  *See also, e.g., Wireless Telecommunications Bureau and Office of Native Affairs and Policy Seek Comment on Tribal Nation and Native Hawaiian Access to Spectrum and Related Data*, GN Docket No. 23-265, Public Notice, 38 FCC Rcd 6760 (WTB-CGB 2023).  *See generally Federal Communications Commission Enhances the Universal Licensing System By Adding Tribal Specific Entity Types*, Public Notice, 39 FCC Rcd 7508 (WTB 2024) (adding a Tribal specific entity type to certain Universal Licensing System forms to "improve identification of how and where Tribal Nations are directly accessing licensed wireless spectrum" and to facilitate exemption from filing fees for Tribal Nations and Tribally controlled business entities).

[161] CTIA Reply at 9–10.

[162] *Spectrum and Secure Technology and Innovation Act* § 5404.

[163] NCAI Comments at 8–9; NNRTC Reply at 5–6.

## VI.    PROCEDURAL MATTERS

64.    *Regulatory Flexibility Act.*  The Regulatory Flexibility Act of 1980, as amended (RFA),[164] requires that an agency prepare a regulatory flexibility analysis for notice-and-comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[165]  Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule and policy changes contained in this Order on small entities.  The FRFA is set forth in Appendix B.

65.    *Paperwork Reduction Act Analysis.*  The Office of Management and Budget (OMB) has approved the collection of information in the Application to Participate in an FCC Auction, FCC Form 175, including collecting five years of annual revenue information from applicants for a small business bidding credit and information from applicants for a rural service provider bidding credit.[166] This Order does not contain new or substantively modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  Therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198.[167]

66.    *Congressional Review Act.*  The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this Report and Order and Second Report and Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

67.    *People with Disabilities*.  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice).

68.    *Further Information.*  For additional information on this proceeding, contact Erik Salovaara of the Office of Economics and Analytics, Auctions Division, at Erik.Salovaara@fcc.gov or Lyndsey Grunewald of the Office of Economics and Analytics, Auctions Division, at Lyndsey.Grunewald@fcc.gov or (202) 418-0660.

## VII.    ORDERING CLAUSES

69.    IT IS ORDERED, pursuant to the authority found in sections 1, 2, 4(i), 303, and 309(j) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i), 303, and 309(j); the Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, H.R. 5009, 118th Cong. Div. D, Title LIV, § 5403, that this Report and Order and Second Report and Order IS ADOPTED.[168]

---

[164] 5 U.S.C. §§ 601 *et seq*., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[165] *Id.* § 605(b).

[166] *See* Office of Information and Regulatory Affairs, Office of Management and Budget, *Information Collection Review*, https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202503-3060-019# (last visited July 24, 2025) (Paperwork Reduction Act information collection approval for FCC Form 175 to collect relevant information through 3/31/2028).

[167] *See* 44 U.S.C. § 3506(c)(4).

[168] Pursuant to Executive Order 14215, 90 Fed. Reg. 10447 (Feb. 20, 2025), this regulatory action has been determined to be not significant under Executive Order 12866, 58 Fed. Reg. 68708 (Dec. 28, 1993).

70.     IT IS FURTHER ORDERED that the rules and requirements as adopted in this Report and Order and Second Report and Order WILL BECOME EFFECTIVE thirty (30) days after publication in the *Federal Register*.

71.     IT IS FURTHER ORDERED that the Office of the Managing Director, Performance Program Management, SHALL SEND a copy of this Report and Order and Second Report and Order in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

72.     IT IS FURTHER ORDERED that the Commission's Office of the Secretary, SHALL SEND a copy of this Report and Order and Second Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX A**

**Final Rules**

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR parts 1 and 27 to read as follows:

**PART 1- PRACTICE AND PROCEDURE**

1.   The authority citation for part 1 continues to read as follows:

AUTHORITY: 47 U.S.C. chs. 2, 5, 9, 13; 28 U.S.C. 2461 note; 47 U.S.C. 1754, unless otherwise noted.

2.   Amend § 1.2110 by revising paragraphs (b)(1)(i) and (f)(2)(i) to read as follows:

**§ 1.2110 Designated entities.**

* * * * *

**(b) Eligibility for small business and entrepreneur provisions —**

**(1) Size attribution.**

(i) The gross revenues of the applicant (or licensee), its affiliates, its controlling interests, and the affiliates of its controlling interests shall be attributed to the applicant (or licensee) and considered on a cumulative basis and aggregated for purposes of determining whether the applicant (or licensee) is eligible for status as a small business, very small business, or entrepreneur, as those terms are defined in the service-specific rules.  An applicant seeking status as a small business, very small business, or entrepreneur, as those terms are defined in the service-specific rules, must disclose on its short- and long-form applications, separately and in the aggregate, the gross revenues for each of the previous five years of the applicant (or licensee), its affiliates, its controlling interests, and the affiliates of its controlling interests.

* * * * *

**(f) Bidding credits. \*\*\***

* * * * *

**(2) Small business bidding credits.**—(i) Size of bidding credits.  A winning bidder that qualifies as a small business, and has not claimed a rural service provider bidding credit pursuant to paragraph (f)(4) of this section, may use the following bidding credits corresponding to its respective average gross revenues for the preceding 5 years:

> (A) Businesses with average gross revenues for the preceding 5 years not exceeding $4 million are eligible for bidding credits of 35 percent;
>
> (B) Businesses with average gross revenues for the preceding 5 years not exceeding $20 million are eligible for bidding credits of 25 percent; and
>
> (C) Businesses with average gross revenues for the preceding 5 years not exceeding $55 million are eligible for bidding credits of 15 percent.

* * * * *

**PART 27—MISCELLANEOUS WIRELESS COMMUNICATIONS SERVICES**

1.  The authority citation for part 27 continues to read as follows:

AUTHORITY: 47 U.S.C. 154, 301, 302a, 303, 307, 309, 332, 336, 337, 1403, 1404, 1451, and 1452, unless otherwise noted.

2.  Amend § 27.1106  by revising paragraphs (a) and (b), and adding paragraph (c) to read as follows:

**§ 27.1106 Designated Entities in the 1695–1710 MHz, 1755–1780 MHz, and 2155–2180 MHz bands.**

\* \* \* \* \*

**(a) Small business.**

(1) A small business is an entity that, together with its affiliates, its controlling interests, and the affiliates of its controlling interests, has average gross revenues not exceeding $55 million for the preceding five (5) years.

(2) A very small business is an entity that, together with its affiliates, its controlling interests, and the affiliates of its controlling interests, has average gross revenues not exceeding $20 million for the preceding five (5) years.

**(b) Bidding credits.** A winning bidder that qualifies as a small business as defined in this section or a consortium of small businesses may use the bidding credit specified in § 1.2110(f)(2)(i)(C) of this chapter, subject to the cap specified in § 1.2110(f)(2)(ii) of this chapter.  A winning bidder that qualifies as a very small business as defined in this section or a consortium of very small businesses may use the bidding credit specified in § 1.2110(f)(2)(i)(B), subject to the cap specified in § 1.2110(f)(2)(ii) of this chapter.

**(c) Rural service provider bidding credit**.  A rural service provider, as defined in § 1.2110(f)(4) of this chapter, which has not claimed a small business bidding credit may use a bidding credit of 15 percent as specified in § 1.2110(f)(4)(i), subject to the cap specified in § 1.2110(f)(4)(ii) of this chapter.

**APPENDIX B**

**Final Regulatory Flexibility Analysis**

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[169] the Federal Communications Commission (Commission) incorporated an Initial Regulatory Flexibility Analysis (IRFA) in the *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses, et al., NPRM* (*Notice*), released in February, 2025.[170] The Commission sought written public comment on the proposals and issues raised in the *Notice*, including comment on the IRFA. No comments were filed addressing the IRFA. This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA and it (or summaries thereof) will be published in the Federal Register.[171]

### A. Need for, and Objectives of, the Rules

2. In the *Report and Order and Second Report and Order* (*Order*) the Commission updates the DE rules for AWS-3 spectrum bands to enable the Commission to offer licenses for spectrum within those bands that is currently in the Commission's inventory through competitive bidding in the near future. In addition, the *Order* resolves all remaining open issues and also addresses comments from small and other entities that were filed in response to the *Notice*. Together, the rules we adopt today will further the Commission's goal of facilitating the use of presently fallow spectrum and further advancing the deployment of fifth generation wireless (5G) services by efficiently bringing to auction licenses covering spectrum that is likely to be used to provide 5G services. In addition, these rules will also foster competition in wireless services by facilitating participation in an auction of licenses for AWS-3 spectrum by entities designated by in section 309(j)(3) and (4) of the Communications Act of 1934, as amended, (the Act) to be given opportunities to participate in spectrum-based services (designated entities or DEs).

3. Specifically, the *Order* adopts rules that provide small businesses and rural service providers with greater opportunities to participate in the provisioning of 5G services by aligning the Commission's outdated, service-specific eligibility requirements for AWS-3 with its current practice. Additionally the Order modifies the part 1 size definitions for small business bidding credits so that the length of time over which revenues are averaged for determining bidding credit eligibility is five years, in conformance with the Small Business Act, as amended.

4. Lastly, the proceeds generated from the auctions will bolster another of the Commission's long-standing objectives: protecting our national security by supporting the Commission's Supply Chain Reimbursement Program, which implements the Secure and Trusted Communications Networks Act of 2019[172] through its reimbursement of eligible advanced communications service providers, some of which are small entities, for their costs incurred through the removal, replacement, and disposal of equipment and services provided by untrustworthy entities such as Huawei Technologies Company or ZTE Corporation.

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

5. There were no comments filed that specifically addressed the information presented in the IRFA.

---

[169] 5 U.S.C. § 603. The RFA, 5 U.S.C. §§ 601–612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[170] *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses, et al.*, GN Docket Nos. 25-70, 25-71, and 13-185, Notice of Proposed Rulemaking, FCC 25-12 (rel. Feb. 28, 2025) (*Notice*).

[171] 5 U.S.C. § 604.

[172] Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159, Div. E, Title LIV, § 5401–5405 (*Spectrum and Secure Technology and Innovation Act*).

### C.       Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

6.       Pursuant to the Small Business Jobs Act of 2010, which amended the RFA,[173] the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and provide a detailed statement of any change made to the proposed rules as a result of those comments.[174]  The Chief Counsel did not file any comments in response to the *Notice*.

### D.       Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

7.       The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[175]  The RFA generally defines the term "small entity" as having the same meaning under the Small Business Act.[176]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[177]  A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[178]

8.       *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe three broad groups of small entities that could be directly affected by our actions.[179]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, in general, a small business is an independent business having fewer than 500 employees.[180]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 34.75 million businesses.[181]  Next, "small organizations" are not-for-profit enterprises that are independently owned and operated and not dominant their field.[182]  While we do not have data regarding the number of non-profits that meet that criteria, over 99 percent of nonprofits have fewer than 500 employees.[183]  Finally, "small governmental jurisdictions" are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less than fifty thousand.[184]  Based on the 2022 U.S. Census of

---

[173] Small Business Jobs Act of 2010, Pub. L. No. 111-240, 124 Stat. 2504 (2010).

[174] 5 U.S.C. § 604(a)(3).

[175] *Id.* § 604(a)(4).

[176] *Id.* § 601(6).

[177] *See* 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[178] 15 U.S.C. § 632.

[179] 5 U.S.C. § 601(3–6).

[180] *See* SBA, Office of Advocacy, *Frequently Asked Questions About Small Business*  (July 23, 2024), https://advocacy.sba.gov/wp-content/uploads/2024/12/Frequently-Asked-Questions-About-Small-Business_2024-508.pdf.

[181] *Id.*

[182] 5 U.S.C. § 601(4).

[183] *See* SBA, Office of Advocacy, *Small Business Facts, Spotlight on Nonprofits* (July 2019), https://advocacy.sba.gov/2019/07/25/small-business-facts-spotlight-on-nonprofits/.

Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.[185]

    9.    *Licenses Assigned by Auctions.* The Commission's small business size standards with respect to licenses assigned by auction involve eligibility for bidding credits in the auction of licenses for various wireless frequencies. In the auction of these licenses, the Commission may define and adopt criteria for different classes small businesses. The criteria for these small business classes may be defined in the Commission's rules[186] or may require consultation with the U.S. Small Business Administration, Office of Size Standards.[187] For licenses subject to auction, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. In addition, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.

    10.    *Wireless Telecommunications Carriers (except Satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[188] Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless Internet access, and wireless video services.[189] The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[190] U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[191] Of that number, 2,837 firms employed fewer than 250 employees.[192] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[193] Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[194] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

    11.    *Advanced Wireless Services (AWS) - (1710–1755 MHz and 2110–2155 MHz bands (AWS-1); 1915–1920 MHz, 1995–2000 MHz, 2020–2025 MHz and 2175–2180 MHz bands (AWS-2); 2155–2175 MHz band (AWS-3); 2000–2020 MHz and 2180–2200 MHz (AWS-4)).* Spectrum is made

---

(Continued from previous page) ————————————————

[184] 5 U.S.C. § 601(5).

[185] *See* U.S. Census Bureau, 2022 Census of Governments –Organization, https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html, tables 1–11.

[186] *See* 47 CFR § 27.702(a)(1–3). This is an illustrative example of three types of small businesses for an auction of licenses in a certain frequency that is codified in the Commission's rules.

[187] *See* 5 U.S.C. § 601(3).

[188] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite)," * https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[189] *Id.*

[190] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[191] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false. At this time, the 2022 Economic Census data is not available.

[192] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[193] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[194] *Id.*

available and licensed in these bands for the provision of various wireless communications services.[195] Wireless Telecommunications Carriers (*except* Satellite)[196] is the closest industry with a SBA small business size standard applicable to these services.  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[197]  U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[198]  Of this number, 2,837 firms employed fewer than 250 employees.[199]  Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

12.      According to Commission data as of December 2021, there were approximately 4,472 active AWS licenses.[200]  The Commission's small business size standards with respect to AWS involve eligibility for bidding credits in the auction of licenses for these services.  For the first auction of AWS licenses, the Commission defined a "small business" as an entity with average annual gross revenues for the preceding three years not exceeding $40 million, and a "very small business" as an entity with average annual gross revenues for the preceding three years not exceeding $15 million.[201]  Pursuant to these definitions, 57 winning bidders claiming status as small or very small businesses won 215 of 1,087 licenses.[202]  In the most recent auction of AWS licenses, 15 of 37 bidders qualifying for status as small or very small businesses won licenses.[203]

13.      In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service.  Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.  Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

14.      *Satellite Telecommunications.*  This industry comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and

---

[195] *See* 47 CFR § 27.1(b).

[196] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite)*," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[197] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[198] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[199] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[200] Based on a FCC Universal Licensing System search on December 10, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = AD, AH, AT, AW; Authorization Type = All; Status = Active. We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[201] *See* 47 CFR §§ 27.1002, 27.1102, 27.1104, 27.1106.

[202] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 66: Advanced Wireless Services (AWS-1), Summary, Spreadsheets, https://www.fcc.gov/sites/default/files/wireless/auctions/66/charts/66cls2.pdf.

[203] *See Auction of Advanced Wireless Services (AWS-3) Licenses Closes; Winning Bidders Announced for Auction 97*, Public Notice, DA-15-131, Attachments A–B, (Auction No. 97) (January 30, 2015).

broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[204]  Satellite telecommunications service providers include satellite and earth station operators.  The SBA small business size standard for this industry classifies a business with $44 million or less in annual receipts as small.[205]  U.S. Census Bureau data for 2017 show that 275 firms in this industry operated for the entire year.[206]  Of this number, 242 firms had revenue of less than $25 million.[207]  Consequently, using the SBA's small business size standard most satellite telecommunications service providers can be considered small entities.  The Commission notes however, that the SBA's revenue small business size standard is applicable to a broad scope of satellite telecommunications providers included in the U.S. Census Bureau's Satellite Telecommunications industry definition.  Additionally, the Commission neither requests nor collects annual revenue information from satellite telecommunications providers, and is therefore unable to more accurately estimate the number of satellite telecommunications providers that would be classified as a small business under the SBA size standard.

      E.      **Description of Economic Impact and Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

      15.     The RFA directs agencies to describe the economic impact of proposed rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.[208]

      16.     The Commission expects that the rules adopted in the *Order* will impose new and/or additional reporting or recordkeeping and/or other compliance obligations on small entities as well as other applicants and licensees.  These obligations are discussed in greater detail below.  The Commission believes that these rules assist the Commission in meeting its statutory goals by facilitating the auction, and subsequent use, of unassigned spectrum.  Further, the Commission does not believe that the costs and/or administrative burdens associated with the adopted rules will unduly burden small entities.  We note that the rules adopted in the *Order* modify requirements that were in place prior to the last major update to the Commission's competitive bidding rules in 2015 in order to bring them in line with the policies and procedures that have been used in auctions of 5G-ready services since 2015.  Therefore, small entities that have participated in Commission auctions since 2015 may already be familiar with such policies and requirements and may have the necessary processes and procedures in place to facilitate compliance, thereby resulting in minimal incremental costs to comply with the modifications adopted in the *Order*.

      17.     Typically, the auction procedures inform prospective applicants that they should familiarize themselves with the Commission's general competitive bidding rules, Commission decisions regarding competitive bidding procedures, application requirements, obligations of Commission licensees, construction permit holders, and support recipients, and the Commission's service rules for the

---

[204] *See* U.S. Census Bureau, *2017 NAICS Definition, "517410 Satellite Telecommunications,"* https://www.census.gov/naics/?input=517410&year=2017&details=517410.

[205] *See* 13 CFR § 121.201, NAICS Code 517410.

[206] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517410, https://data.census.gov/cedsci/table?y=2017&n=517410&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.  At this time, the 2022 Economic Census data is not available.

[207] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[208] 5 U.S.C. § 604(a)(5).

frequency band available in the auction or for construction permits or universal service support, and that they must be thoroughly familiar with the procedures, terms, and conditions contained in the public notice adopting procedures for the auction.[209] We therefore do not expect that the amended definitions adopted in the *Order* will increase the need for small entities to hire attorneys, engineers, consultants, or other professionals because it does not increase the level of education or due diligence beyond what was required of applicants under the previous competitive bidding rules for the AWS-3 spectrum bands.

18.     As mentioned, the *Order* adopts rule changes that will affect reporting, recordkeeping, and/or other compliance requirements for small and other entities.  The *Order* amends the Commission's rules related to designated entities eligible for bidding credits for licenses subject to auction in the AWS-3 bands.  It adopts the same revenue thresholds that the Commission has used in recent years to determine eligibility for small and very small business bidding credits, which are provided for in the Commission's part 1 standardized schedule of bidding credits.  It also amends the AWS-3 bidding credit eligibility criteria to align with the amended Small Business Act's requirement that federal agencies that categorize business concerns that provide services as a "small business concern" based on annual average gross receipts only do so if the agency considers such receipts "over a period of not less than five years." Specifically, we adopt a requirement for an entity to have average gross revenues for the preceding five years not exceeding $55 million to be a small business, and such an entity would be eligible for a bidding credit of 15%.  To be classified as a very small business an entity would be required to have average gross revenues for the preceding five years not exceeding $20 million and would be eligible for a bidding credit of 25%.[210]  We also adopt a rural service provider bidding credit for auctions of licenses for AWS-3 spectrum that has been offered.  Lastly, the *Order* modifies the Commission's general part 1 competitive bidding rules to incorporate the five-year average gross receipts benchmark for the purpose of determining which entities qualify for small business bidding credits for consistency with the Small Business Act.

### F.     Discussion of Steps Taken to Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered

19.     The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[211]

---

[209] *See, e.g.*, *Auction 107 Procedures Public Notice*, 35 FCC Rcd at 8407, para. 5; *Auction of Priority Access Licenses in the 3550–3650 GHz Band; Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 105; Bidding in Auction 105 Scheduled to Begin June 25, 2020*, AU Docket No. 19-244, Public Notice, 35 FCC Rcd 2140, 2143, para. 5 (2020).

[210] The standardized schedule of bidding credits provided in Section 1.2110(f)(2)(i) defines small businesses based on average gross revenues for the preceding three years.  In December 2018, Congress revised the standard set out in the Small Business Act for categorizing a business concern as a "small business concern," by changing the annual average gross receipts benchmark from a three-year period to a five-year period.  Thus, as a general matter, a federal agency cannot propose to categorize a business concern as a "small business concern" for Small Business Act purposes unless the size of the concern is based on its annual average gross receipts "over a period of not less than 5 years."  15 U.S.C. § 632(a)(2)(C)(ii)(II), *as amended by* SBERA, Pub. L. 115-324 (Dec. 17, 2018).  We therefore adopt the Small Business Act's revised five-year average gross receipts benchmark for purposes of determining which entities qualify for small business bidding credits.  But because the SBA has not yet revised its regulations to update the definition of "small business concern," for purposes of compliance with the Regulatory Flexibility Act, the Commission will continue to use the SBA's current definitions of "small business," which is based on a three-year benchmark.

[211] 5 U.S.C. § 604(a)(6).

20.     The rules adopted by the Commission in the *Order* reflect its efforts to minimize significant economic impact to small entities where practicable and its consideration of various alternatives in reaching its conclusions.  For example, the adopted rules update the competitive bidding rules for the AWS-3 spectrum bands to align with current practices.  We considered alternatives that would apply rules that deviated from our prevailing practices.  However, by adopting rules similar to the DE rules that have been used in recent auctions of wireless, 5G-ready spectrum, compliance burdens on small businesses will be minimized, as many small businesses will already be familiar with these requirements.  As a result, the adopted approach could lessen the compliance costs for small entities who have participated in any wireless spectrum auction since 2015.

21.     *Competitive Bidding and Bidding Credits for Small Entities*.  The Commission administers bidding credit programs to promote small business service provider participation in auctions and in *the* provision of spectrum-based services.  Based on our analysis of past auction data, the relative costs of participation are lowered for small businesses that take full advantage of the bidding credit programs.  The current DE rules for auctions of licenses in AWS-3 spectrum bands were adopted prior to the last major update to the part 1 competitive bidding rules in 2015.  Thus, as mentioned in the prior section, we have modified these DE rules so that they conform with the DE rules set forth in part 1, subpart Q, of the Commission's rules and are consistent with recent auctions.  Specifically, we modify the DE rules for AWS-3 to apply the current part 1 definition of a qualifying "small business" and a "very small business"[212] and apply the bidding credits for these two categories, and for rural service providers.  We also modify the part 1 size definitions for small business bidding credits so that the amount of time over which revenues are averaged for determining bidding credit eligibility is five years, in conformance with the Small Business Act.[213]  We considered comments suggesting the Commission implement larger bidding credits for small businesses.  We conclude, however, that the bidding credit percentages adopted in the *Order* will sufficiently enable small businesses seeking to participate in auctions to gain access to capital, thereby fostering their increased participating and competitive in auctions, without incentivizing gamesmanship.

22.     In addition, to reduce costs to small and other entities, the Commission provides resources and educational materials to assist all auction participants, including small entities, with understanding the requirements of auction participation, including applying for bidding credits.  Small entities and other auction participants may seek clarification of, or guidance regarding, auction procedures, the competitive bidding rules, and any requirements related to the authorizations or support to be made available through the auction from Commission staff prior to each auction's application window.  Further, an FCC Auctions Hotline provides small entities one-on-one access to Commission staff for information about the auction process and procedures.  Lastly, through the FCC Auctions Technical Support Hotline, the Commission provides a technical assistance resource to small entities and other applicants, on issues such as access to or navigation within the electronic short-form application (FCC Form 175) and use of the bidding system.

### G.     Report to Congress:

23.     The Commission will send a copy of the *Order*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[214]  In addition, the Commission will send a copy of the *Order*, including this Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the SBA and will publish a copy of the *Order*, and this Final Regulatory Flexibility Analysis (or summaries thereof) in the Federal Register.[215]

---

[212] 47 CFR § 1.2110(f)(2)(i).

[213] *See* 15 U.S.C. § 632(a)(2)(C)(ii)(II), *as amended by* SBREA, Pub. L. 115-324 (Dec. 17, 2018).

[214] 5 U.S.C. § 801(a)(1)(A).

[215] *Id.* § 604(b).

**APPENDIX C**

**List of Commenters**

<u>Comments</u>

Benton Institute for Broadband & Society
Blooston Rural Carriers (Blooston)
Competitive Carrier Association (CCA)
Council Tree Investors, Inc. (Council Tree)
CTIA
EchoStar Corporation
Institute for Local Self-Reliance
Moore, Kelly; Moore, Aubry; Moore, Brennan; and Moore, Harlan (the Moores)
National Congress of American Indians
Navajo Nation Telecommunications Regulatory Commission (NNTRC)
Open Technology Institute at New America
Public Knowledge
Rural Wireless Association, Inc. (RWA)
Shoshone-Bannock Tribes
Tribal Digital Village Network
Waskawiwin
WISPA – The Association for Broadband Without Boundaries (WISPA)
X-Lab

# STATEMENT OF
# CHAIRMAN BRENDAN CARR

Re:　　*Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses; et. al,* Report and Order and Second Report and Order, GN Docket Nos. 25-70, 25-71, 13-185 (July 24, 2025)

July 2025 is an important milestone in America's spectrum policy.

As part of the One Big Beautiful Bill, which President Trump signed into law on the 4th of July, Congress restored the FCC's spectrum auction authority. This ended a two-year period when that authority lapsed and America's spectrum spigot was shut off. Even more, the new law directs the Commission and NTIA to free up no less than 800 megahertz of spectrum, creating a robust pipeline for 5G and next-gen wireless services.

Two days before the bill became law, I announced that restoring America's leadership in wireless would be one of the central pillars of the Commission's new Build America Agenda. The spectrum provisions of the Big Beautiful Bill will give our agenda a big boost, because freeing up spectrum creates jobs, increases competition, and drives down prices for consumers. Basically—more spectrum means more building.

From my first day as Chairman, I made every effort to get more spectrum in the marketplace. At my very first open meeting as FCC Chairman, the initial item we considered was a proposal to kickstart the process for reauctioning a large number of licenses in the so-called AWS-3 bands (1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz). These are spectrum licenses that have been laying fallow for years.

With today's action, we move another step closer to that auction and getting these powerful bands into consumers' hands, where they belong. We do so by establishing the designated entity eligibility requirements for the auction. This item also creates a 15 percent bidding credit for qualifying rural service providers—an important step to closing the digital divide.

But restoring America's leadership in wireless is not the only objective of our Build America Agenda that an AWS-3 auction will advance. National security is another. That is because the proceeds from this auction will be used to complete the "rip and replace" program to protect our networks from untrustworthy and insecure foreign equipment.

For their work on this item, I'd like to thank Maureen Flood, Lyndsey Grunewald, Mike Gussow, Bill Huber, Madelaine Maior, Erik Salovaara, and Jeff Tignor.

# STATEMENT OF
# COMMISSIONER ANNA M. GOMEZ

Re:     *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses; et. al,* Report
        and Order and Second Report and Order, GN Docket Nos. 25-70, 25-71, 13-185 (July 24, 2025)

        With today's Order, we implement a congressional directive on the AWS-3 spectrum licenses
remaining in inventory.  Preparing for this auction allowed us to continue to exercise our auction muscles
while we waited for our auction authority to be reinstated.  While I believe the Federal Communications
Commission (FCC, Commission) could have conducted both a Tribal Licensing Window and an AWS-3
auction within the timeframe Congress indicated, I understand that the Commission's interpretation of
Congress's directive in this Act was to move to auction expeditiously.  For these reasons I approve in part
and concur in part.

        Notwithstanding my partial concurrence, I would like to thank the Chairman and his staff for
working with me on edits to this Order that affirm our Trust Responsibility to Tribal Nations.

        The United States Trust Responsibility to Tribes is a legal obligation established by the
Constitution, Tribal Treaties, and more than a hundred years of Supreme Court precedent.[216]  As part of
the federal government, the FCC has this responsibility.  Under this principle, we engage with Tribal
Nations on a government-to-government basis, a practice known as the Trust Relationship, and are
charged with carrying out the law in a manner that supports Tribal sovereignty.  With regard to spectrum
policy, the unique legal framework and relationship between the federal government and Tribes requires
us to ensure that Tribes have a fair and meaningful opportunity to secure spectrum rights essential to their
economic development, public safety, and cultural preservation.

        In the record for the auction of AWS-3 licenses, at least twelve stakeholders across various
comments agreed with this approach and supported a Tribal Licensing Window.[217]  The Navajo Nation,
the Shoshone-Bannock Tribes, a Tribal regulatory entity, a national organization representing hundreds of
Tribal Governments, an intertribal organization representing more than 50 Tribes with large reservations,
a Tribal wireless broadband provider, a non-profit that trains Tribes to build and operate Internet
networks, and numerous public interest groups asked us to hold a Tribal Licensing Window.[218]  Holding a
Tribal Licensing Window is consistent with and acknowledges our Trust Responsibility.  While we will
not hold a window in this auction, I am grateful to Chairman Carr for agreeing to seek comment about
Tribal Licensing Windows in future auction proceedings.  I look forward to future auctions now that our
auction authority is restored.

---

[216] *See* U.S. Const. art. I, § 8, cl. 3; *Cherokee Nation v. Georgia*, 30 U.S. 1, 16 (1831); *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942); *see generally* Cohen's Handbook of Federal Indian Law §5.04(3) (Nell Jessup Newton ed., 2012).

[217] National Congress of American Indians, et al., (NCAI) Comments; Navajo Nation Telecommunications Regulatory Commission (NNTRC) Comments; Shoshone-Bannock Tribes (SBT) Comments; Coalition of Large Tribes (COLT) Comments; Letter From Dr. Buu Nygren, President, The Navajo Nation, to Brendan Carr, Chairman, FCC GN Docket Nos. 25-70, 25-71, 13-185, at 2 (Feb. 20, 2025); Letter from Nat Purser, Government Affairs Policy Advocate, Public Knowledge, et al. to Marlene H. Dortch, Secretary, FCC, GN Docket Nos. 25-70, 25-71, 13-185 (July 11, 2025) (PK Letter); Letter from Michael Calabrese, Director, Wireless Future Open Technology Institute at New America and Harold Feld, Senior Vice President, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, GN Docket Nos. 25-70, 25-71, 13-185 (Apr. 21, 2025); Letter from the United Church of Christ Media Justice Ministry, et al. to Marlene H. Dortch, Secretary, FCC, GN Docket Nos. 25-70, 25-71, 13-185 (Apr. 28, 2025) (UCC Letter).

[218] *See* NNTRC Comments; Shoshone-Bannock Tribes Comments at 1; NCAI Comments; UCC Letter; COLT Comments; and PK Letter.

The record for Auction 113 also highlighted an ongoing problem that impedes connectivity on Tribal lands: there are cases in which auction winners acquire licenses that include Tribal lands but fail to build out on those lands.[219]  Here, again, I am glad that in this item we are committing to finding ways to address the connectivity challenges that Tribal Nations face.  I hope this commitment includes looking into complaints about unused spectrum, as overseeing the efficient use of spectrum is of paramount importance to our Agency.

To carriers, I want to remind you of the importance of serving all areas, including Tribal lands, and not letting spectrum sit unused.  To Tribal Nations facing this issue, I want you to know that we take these complaints seriously.  Cognizant of our Trust Responsibility, we will monitor the situation, and I commit to support seeking comment in future auctions on whether to adopt rules implementing forced partitions, "use or share," and "use or lose" conditions on licenses over Tribal lands where carriers fail to build out using spectrum acquired at auction.

Thank you.

---

[219] NNTRC Comments at 11.

**STATEMENT OF
COMMISSIONER OLIVIA TRUSTY**

Re: *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses; et. al,* Report and Order and Second Report and Order, GN Docket Nos. 25-70, 25-71, 13-185 (July 24, 2025)

By updating the competitive bidding rules for auctioning the Commission's inventory of AWS-3 spectrum, we advance good policy on two important fronts, and check two long-standing items off of the FCC's to-do list.

First, we lay the groundwork to auction this valuable spectrum so it can be put to its highest and best use: improving service quality and delivering faster internet speeds for consumers. The licenses to be offered in a future auction will enhance coverage in diverse geographic areas and deliver a much-needed injection of spectrum for LTE and 5G deployment.

Second, we help enhance the security of our networks. Proceeds from the AWS-3 auction will help fund the Commission's Supply Chain Reimbursement Program, which supports the removal and replacement of untrusted equipment from companies like Huawei and ZTE. While we've made significant national progress in securing our networks, threats persist, as both Congress and the Commission have recognized. Fully funding "Rip and Replace" is essential to rooting out remaining vulnerabilities, safeguarding our communications infrastructure, driving economic growth, and preserving U.S. leadership in next-generation wireless technologies.

I thank the FCC staff for their work on today's item and for moving swiftly to bring the AWS-3 spectrum to auction. I also commend the President and Congress for their work to address the nation's spectrum shortage in the One Big Beautiful Bill, by restoring the FCC's general auction authority, building out a forward-looking spectrum pipeline, and recognizing that resilient, secure networks are fundamental to our economic and national security.

# EXHIBIT B

## List of persons served per Fed. R. App. P. 15(c)(2)


Carri Bennet
Stephen Sharbaugh
Rural Wireless Association, Inc.
5185 MacArthur Blvd. NW
Suite 720
Washington, DC 20016

Frances Goli
Shoshone-Bannock Tribes Land
Use Department
PO Box 306
Fort Hall, ID 83203

James E. Dunstan
Mobius Legal Group, PLLC
P.O. Box 6104
Springfield, VA 22150
*Counsel for Navajo Nation*
*Telecommunications Regulatory*
*Commission*

Byron Short
Navajo Nation
Telecommunications Regulatory
Commission
P.O. Box 7740
Window Rock, AZ 86515

Louis Peraertz
WISPA
200 Massachusetts Ave NW
Suite 700
Washington, DC 20001

Harold Feld
Public Knowledge et al.
1818 N St NW
Suite 410
Washington, DC 20036

D. Cary Micthell
John. A. Prendergast
Blooston, Mordkofsy, Dickens &
Prendergast, LLP
2120 L Street NW
Suite 825
Washington, DC 20037

Dennis P. Corbett
Ashley Brydone-Jack
Telecommunications Law
Professional PLLC
1025 Connecticut Ave NW
Suite 1011
Washington, DC 20036
*Counsel for Council Tree*
*Investors, Inc.*

Geoffrey C. Blackwell
National Congress of American
Indians
1516 P Street NW
Washington, DC 20005

Courtney F. Tolerico
Umair Javed
Scott K. Bergman
Sarah K. Leggin
CTIA
1400 Sixteenth Street, NW
Washington, DC 20036

Angela Simpson
John A. Howes, Jr.
Alexandra Mays
Competitive Carriers Association
601 New Jersey Ave NW
Suite 820
Washington, DC 20001

Michael Calabrese
Open Technology Institute at New
America
740 15th Street, NW
Suite 900
Washington, DC 20005

Oliver J. Semans Sr.
Coalition of Large Tribes
tateota@hotmail.com

# CERTIFICATE OF SERVICE

I, Andrew Magloughlin, hereby certify that, on August 29, 2025, I caused a copy of the foregoing petition to be served upon the FCC by electronic mail (per the note to 47 C.F.R. § 1.13(b)) directed to:

Adam Candeub
Office of General Counsel
Federal Communications Commission
45 L Street NE
Washington, DC  20554
LitigationNotice@fcc.gov

In addition, I also caused a copy of the foregoing petition to be served by First Class Mail on:

Pamela Jo Bondi
Attorney General
United States Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530

/s/ *Andrew Magloughlin*
Andrew Magloughlin
STEPTOE LLP
1330 Connecticut Ave, NW
Washington, DC 20036
202-429-3000